**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Gordon Taylor JENNELL,
Defendant-Appellant.**

No. 84–1065.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 2, 1984.

Decided Dec. 18, 1984.

As Amended March 18, 1985.

John M. Roll, Asst. U.S. Atty., Tucson, Ariz., for plaintiff-appellee.

Jeffrey D. Bartolino, Tuscon, Ariz., for defendant-appellant.

Before FERGUSON and NELSON, Circuit Judges, and JAMESON,* District Judge.

* The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

JAMESON, District Judge:

Gordon Taylor Jennell has appealed his conviction, following a jury trial, of conspiracy to import marijuana in violation of 21 U.S.C. §§ 952(a), 963, and conspiracy to distribute marijuana in violation of §§ 841(a)(1), 846. He contends that the district court erred in (1) refusing to instruct the jury on the defense of duress or coercion; (2) denying Jennell's motion to suppress the contents of his briefcase; (3) admitting into evidence handwritten documents found in a co-conspirator's briefcase; and (4) refusing to instruct the jury regarding lost or destroyed evidence. We affirm.

## I. Factual Background

Jennell was a participant in a conspiracy to import and distribute 32,000 pounds of marijuana. The marijuana was to be smuggled from Colombia to Arizona or Nevada on a DC–7 aircraft. If the conspirators had been successful, Jennell's estimated share of the profits would have been $750,000. Jennell asserts that he became involved with the conspiracy because of threats made on his and his family's lives. The facts, as alleged by Jennell, follow.

In September or October of 1980 Jennell's ex-wife discovered a death threat on the windshield of the car she was driving. Jennell owned the car. Jennell reported the threat to the FBI which informed the Santa Barbara Police. No action was taken by the authorities.[1]

In November, 1980, Eduardo Jiminez, a former Los Angeles policeman, accompanied by several Columbians armed with machine guns, barged into Jennell's home. Jennell had been involved with smuggling drugs before and a prior co-conspirator believed that Jennell had stolen an aircraft from him. He had sent Jiminez to collect $150,000, the value of the stolen aircraft. Because Jennell didn't have the money Jiminez said that he (Jennell) would have to help in a marijuana smuggling conspiracy by locating an aircraft and crew and gener-

ating investment money or face death of himself and his family.[2]

Jennell claims that he had been out of the drug smuggling business since his conviction of smuggling drugs in 1976. But, because of the threats, in December, 1980, he contacted Roland Talkington (who proved to be a government informant) about purchasing a suitable aircraft.

Because Jennell had been unable to locate a qualified flight crew or raise sufficient capital, he was expelled from the "organization" in late February, 1981. However, in mid-March, 1981 the main organizers, Irving Hoffman and Gregory Matthews, were arrested on an unrelated drug charge. Jennell was told by the girl friend of one of the arrested conspirators that Jiminez wanted him (Jennell) to contact another conspirator. He did so immediately and was again involved in the conspiracy.

In April, 1981, Jennell met with Jiminez. Jiminez threatened him with a shotgun. While they were together, the Los Angeles Police Department arrested them both because Jennell had been mistakenly identified as a fugitive. Jennell told the police officers that he had just been threatened by Jiminez. Jiminez was not questioned by the police. Both were released as soon as the mistaken identification was realized.

Jennell was again visited by Jiminez in December, 1981. Jiminez handed Jennell a police report concerning the April 8, 1981 threats, together with a proposed retraction. Jennell claims a threat was again made by Jiminez that Jennell should sign the retraction or face death.

On January 27, 1982, the two count indictment was returned against Jennell, Matthews, Hoffman, Jiminez and seven other co-conspirators.

## II. Duress Instruction

The primary issue on this appeal is whether the evidence was sufficient to re-

---

1. It may be noted, however, the death threat contained no name or address and did not provide any clue as to the identity of the culprit.

2. Jennell did not report this threat and is now contending that he did not do so because his previous report to the FBI had afforded him no protection from Jiminez.

quire the giving of a duress or coercion instruction. The court admitted evidence on the issue of duress. The court refused, however, to give the requested duress instruction, relying on *United States v. Atencio*, 586 F.2d 744 (9th Cir.1978) (Per Curiam), stating that it was very clear from that case that "fear alone will not legally justify or excuse."

■ Before a defendant is entitled to a duress instruction, he must establish a *prima facie* case of the three elements of the defense of duress:

(1) an immediate threat of death or serious bodily injury,

(2) a well-grounded fear that the threat will be carried out, and

(3) no reasonable opportunity to escape the threatened harm.

*United States v. Contento-Pachon*, 723 F.2d 691, 693 (9th Cir.1984) (quoted in *United States v. Karr*, 742 F.2d 493, 497 (9th Cir.1984); *United States v. Shapiro*, 669 F.2d 593, 596 (9th Cir.1982). A fourth element is also sometimes required: the defendant must submit to proper authorities after attaining a position of safety. *Contento-Pachon*, 723 F.2d at 693; *United States v. Peltier*, 693 F.2d 96, 98 (9th Cir. 1982) (per curiam). This usually has independent importance only to prison escape cases. As noted in *Contento-Pachon*, however, in cases not involving escapes from prison there seems little difference between the third basic requirement that there be no reasonable opportunity to escape the threatened harm and the obligation to turn oneself in to authorities on reaching a point of safety. Accordingly we held that

a defendant who has acted under a well-grounded fear of immediate harm with no opportunity to escape may assert the duress defense, if there is a triable issue of fact whether he took the opportunity to escape the threatened harm by submitting to authorities at the first reasonable opportunity.

*Id.* at 695.

■ As noted by the district court, fear alone is not sufficient to make a *prima* *facie* case of duress. The defendant must also establish the other two elements of the defense—an *immediate* threat of harm and no reasonable opportunity to escape.

Jennell relies on *United States v. Contento-Pachon* to support his contention that he has presented a triable issue of duress. In that case the district court granted a motion *in limine* to exclude all evidence pertaining to the defense of duress because it found, as did the district court in this case, that the defendant had not established a *prima facie* case of duress. This court reversed, finding that there were disputed factual issues on the question of the defense and that the "trier of fact should have been allowed to consider the credibility of the proffered evidence." 723 F.2d at 695 & n. 2. A close examination and comparison of the facts in *Contento-Pachon* with the facts in this case reveal crucial differences.

In *Contento-Pachon* the appellant was a taxicab driver in Bogota, Colombia who was offered a job as a private car driver by a passenger, Jorge. When he met with Jorge to talk about the job, Jorge instead proposed that Contento-Pachon swallow cocaine-filled balloons and transport them to the United States. Jorge told him not to contact the police or he would "get into serious trouble." Contento-Pachon believed that the Bogota police were corrupt so he did not contact them. *Id.* at 693.

When Contento-Pachon told Jorge that he would not carry the cocaine, Jorge mentioned facts about Contento-Pachon's personal life, including private details he had never mentioned to Jorge. Jorge told him to cooperate or his wife and three-year old child would die. The following day Jorge again threatened the lives of Contento-Pachon's family. Contento-Pachon then agreed to take the cocaine to the United States. He was informed that he would be watched at all times and if he failed to do as he was told that his family would die. When he arrived in Los Angeles he consented to having his stomach x-rayed and the cocaine was discovered. *Id.* at 694.

**1306**

This court found that "Contento-Pachon's contention that he was operating under threat of immediate harm was supported by sufficient evidence to present a triable issue of fact." *Id.*

■ Jennell, on the other hand, was not being constantly watched. There was no threat of immediate retaliation. In fact, when Jennell had failed to perform the requested actions properly he was expelled from the organization. Neither he nor any member of his family was harmed. We conclude that there was not sufficient evidence to support a conclusion that Jennell acted under threat of immediate harm.

In *Contento-Pachon* we also held that although Contento-Pachon was not physically restrained prior to the time that he swallowed the balloons, a juror might find that he had no reasonable means of escape. Whether it was reasonable for Contento-Pachon not to trust the police and therefore not report Jorge's actions was also deemed to be a question of fact for the jury. Contento-Pachon's only real means of escape, if the police were indeed corrupt, was to flee, along with his wife and child, beyond the reaches of the drug traffickers. "A juror might find that that was not a reasonable avenue of escape." *Id.* at 694.

■ Unlike the *Contento-Pachon* case, the conspiracy in this case dragged on for a period of more than a year. During that period there were times of inactivity, even a period when Jennell was out of the organization. Jennell presented no evidence "which would indicate that he had no opportunity to avoid violating the law without subjecting himself to further immediate danger." 586 F.2d at 747. We conclude that there was not sufficient evidence to support a conclusion that Jennell had no reasonable means of escape.

■ There was no evidence in *Contento-Pachon* that the defendant had ever engaged in any illegal activity previously. On the other hand, Jennell admittedly had

been convicted of drug smuggling in the past. Moreover, he was an active participant in the conspiracy for a substantial part of the time during a 14 month period. Contento-Pachon, at his first opportunity to cooperate with authorities he could trust, without alerting his observer, submitted to the x-ray. Jennell had five months to contact authorities. When he told the police in April, 1981, that he was threatened by Jiminez, he still did not report the conspiracy. There is no evidence that Jennell submitted to authorities at the first reasonable opportunity.

The district court properly refused the requested duress instructions. Jennell failed to prove an immediate threat of harm, that he had no reasonable opportunity to escape the threatened harm, or that he submitted to authorities at the first reasonable opportunity.

The recent case of *United States v. Karr, supra,* is more nearly on point and supports our conclusion that Jennell did not establish a *prima facie* case of duress. Karr claimed that he agreed to kill someone because he and his family had been threatened. The attempt was discovered after a bomb wired to the ignition system of the would-be victim's vehicle failed to explode. Karr had identified the vehicle and had given instructions in the wiring of the bomb. This court found that there had been no *"immediate* threat." It also found that Karr had "passed up many opportunities to escape." Accordingly the court held that the district court did not err in refusing to give a duress instruction. *Id.,* at 497.

### III. *Motion to Suppress Evidence*

■ In mid-March, 1981, Matthews and Hoffman were arrested by the Los Angeles police on unrelated narcotics charges. Matthews, who was arrested outside his apartment, gave the police permission to search his apartment. The searching officer found two briefcases—one tan briefcase belonged to him and the black briefcase discovered in a closet belonged to

"Ray Brown," an alias used by Jennell. Jennell and Matthews were then under investigation of the DC–7 venture. The officer later testified that he believed Matthews' statement that the black briefcase belonged to Ray Brown and not to Matthews. The officer immediately opened Matthews' briefcase and searched it but did not open Jennell's. Matthews' briefcase contained a small quantity of hashish and numerous papers labeled "Greg's airplane case." The officer took Jennell's closed briefcase to the Los Angeles Police Department, where it was opened and the contents inventoried.[3] Jennell contends that his Fourth Amendment rights were violated when the police searched his briefcase and that therefore the documents found therein should not have been admitted into evidence.

We need not discuss the merits of Jennell's claim because the harmless error doctrine would preclude reversal even if admission of the contents of Jennell's briefcase violated the Fourth Amendment. The documents admitted at trial from Jennell's briefcase were merely duplicative of those found in Matthews' briefcase. The admission of such cumulative evidence constitutes harmless error. *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967); Fed.R.Crim.P. 52(a).

### IV. *Admission of Documents in Defendant's and Co-Conspirator's Briefcase*

Numerous handwritten notes and other documents concerning the purchase of the DC–7 aircraft and other matters relating to the conspiracy, found in Matthews' briefcase, and at Hoffman's residence, were ad-

mitted in evidence.[4] Jennell contends that the court erred in admitting this evidence under Rule 801(d)(2)(E) of the Federal Rules of Evidence and the admission violated the defendant's confrontation rights.

■ Rule 801(d)(2)(E) of the Federal Rules of Evidence provides that a statement is not hearsay if offered against a party and is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Jennell argues that the admitted documents did not satisfy the "in furtherance" requirement of Rule 801(d)(2)(E). Jennell admits that the writings indicate various expenditures, requirements, and potential profits, which were all relevant to the conspiracy. There was "[s]ufficient evidence . . . to support an inference that the statements were made in furtherance of the conspiracy." *United States v. Eubanks,* 591 F.2d 513, 519 (9th Cir.1979). The district court did not abuse its discretion in making an independent finding that the statements were made in furtherance of the conspiracy.

Jennell also relies upon *United States v. Ordonez,* 737 F.2d 793 (9th Cir.1984), to support his argument that the documents were inadmissible under the Confrontation Clause. In that case, we reversed a defendant's conspiracy conviction because the author of the evidence admitted under the admission exception to the hearsay rule was never established.[5] We held that:

> Where an accused claims that an out-of-court statement was received into evidence in violation of the Confrontation Clause, the record must show that the government produced the declarant or presented facts showing that such person

---

**3.** In denying Jennell's motion to suppress the contents of the briefcase, the district court concluded that there was no evidence which would indicate that Jennell "expected to retain an exclusive privacy interest in the [brief]case and its contents" and that "Matthews possessed a sufficient relationship to the [brief]case so [sic] to consent to its search."

**4.** One document shows that Jennell was to receive $750,000 profit. Jennell admitted on

cross-examination that he had written this document and that the computation was made by Matthews, Hoffman and himself.

**5.** The evidence at issue was a ledger. The author of the entries for over a month was never identified.

was unavailable. *Ohio v. Roberts,* 448 U.S. 56, 65, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597 (1980). 737 F.2d at 801.

In this case the author of most of the documents found in co-conspirator Matthews' briefcase and co-conspirator Hoffman's residence was not established. There was evidence, however, to indicate that the author of many questioned documents necessarily was one of the conspirators; and Matthews and Hoffman were both available for cross-examination. In these respects *Ordonez* is distinguishable; but it is clear here, as in *Ordonez,* that the author of some of the documents was not established. Accordingly, we proceed to determine whether their admission was, as the Government contends, harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

■ Jennell admitted on the stand that he authored three of the handwritten notes found in co-conspirator Matthews' briefcase. One of these documents detailed the membership of the conspiracy along with the distribution of the anticipated profits. These incriminating documents were admissible as admissions under Rule 801(d)(2)(A) and the defendant cannot now claim error in their admission. Through handwriting analysis the Government was also able to establish that some of the documents found in the defendant's own briefcase were authored by the defendant. Reviewing the evidence as a whole, we conclude that the cumulative nature of the unascribed and therefore improperly admitted documents rendered their admission harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967).

## V. *Lost Evidence Instruction*

Because of personnel turnover in the property room and the resulting confusion, Jennell's briefcase, which was seized during the search of Matthews' home, was destroyed together with the documents contained therein. The photocopies of the destroyed documents, however, were not destroyed. Two tape recordings were destroyed and one tape recording was lost. These recordings were of conversations among the conspirators. Jennell requested a jury instruction which would permit the jury to infer that the true facts of the destroyed evidence were against the government's interest. The court refused the instruction. Jennell claims that the failure to give this instruction denied him due process.

■ The usual sanction when the government has lost or destroyed evidence is suppression of secondary evidence. *See United States v. Loud Hawk,* 628 F.2d 1139, 1146 (9th Cir.1979), *cert. denied,* 445 U.S. 917, 100 S.Ct. 1279, 63 L.Ed.2d 602 (1980). The trial court will grant the motion for suppression if the defendant can show (1) bad faith or connivance on the part of the government, and (2) that he was prejudiced by the loss or destruction of the evidence. *Id.* While there was no motion here to suppress secondary evidence, the same rules are applicable with respect to the alternative sanction of giving the requested instruction.

■ Jennell has failed to show either bad faith or prejudice in the loss or destruction of the evidence. He does not even allege that the evidence was lost or destroyed in bad faith. In fact, it was the Los Angeles Police Department that lost or destroyed the evidence. This court has refused "to impute to the federal government the loss or destruction of evidence by other authorities over whom it has no authority or control." *Loud Hawk,* 628 F.2d at 1149. Nor has Jennell shown any prejudice. Photocopies of the destroyed documents were made available to the defendants. The authenticity of the copies was not questioned. Moreover, in refusing to give the requested instruction, the court told counsel for the

defendants that the loss or destruction of the evidence could be argued to the jury. It was not an abuse of discretion for the district court to refuse Jennell's requested jury instruction.

We find no reversible error. The conviction is

AFFIRMED.