**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Luis BELTRAN–RIOS,
Defendant–Appellant.**

**No. 88–5279.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 2, 1989.

Decided July 6, 1989.

Janice Hogan, Federal Defenders of San Diego, Inc., San Diego, Cal., for defendant-appellant.

Patrick K. O'Toole, Asst. U.S. Atty., San Diego, Cal., for plaintiff-appellee.

Before FLETCHER, NELSON and NORRIS, Circuit Judges.

FLETCHER, Circuit Judge:

Beltran–Rios was convicted of importation of a controlled substance and possession of a controlled substance with intent to distribute. He appeals the conviction, contending that the district court erred in allowing the Government to introduce expert testimony describing the "profile" characteristics of drug couriers, and that the jury instruction on the elements of Beltran's duress defense was erroneous. We affirm.

## I.

### FACTS

At approximately 9:00 a.m. on February 16, 1988, Luis Beltran–Rios entered the pedestrian inspection area of the Calexico, California Port of Entry. Customs Agent Donald Hylton performed a pat-down search of Beltran and found three small packages of heroin in Beltran's shoes. Beltran was placed under arrest, and was questioned by Customs and DEA agents. During the course of this questioning, Beltran gave several conflicting explanations for the presence of heroin in his shoes.

On February 22, 1988, a two count indictment was filed in the United States District Court for the Southern District of California, charging Beltran with violations of 21 U.S.C. §§ 952, 960 (importation of a controlled substance) and 21 U.S.C. § 841(a)(1) (possession of a controlled substance with intent to distribute). On February 26, Beltran pleaded not guilty. Beltran filed a motion to suppress physical evidence as well as statements he made to Customs and DEA agents. The district court denied this motion after an April 25 hearing. A jury trial began on May 17, 1988.

Beltran offered duress as his major defense at trial. Beltran argued that he brought heroin into the United States

against his will because an individual named Jesus Holguin Lopez approached him and demanded that he do so. Lopez allegedly threatened to kill Beltran or his family if he did not comply. Beltran presented testimony from a Father Augustin Gonzalez–Magana attesting to Beltran's good reputation and Lopez's reputation as a dangerous drug trafficker. In his opening statement, defense counsel also emphasized Beltran's vulnerability to Lopez's threats, portraying Beltran as a simple, poor farmer. Counsel pursued a related theme in cross-examination, questioning witnesses about Beltran's appearance in an effort to emphasize that Beltran dressed poorly, and did not display flashy or expensive jewelry.

Allegedly to rebut the "poor simple farmer" theme, the Government introduced expert testimony describing the characteristics of the typical drug courier, or "mule." The Government's expert witness, Deputy Sheriff Jose Moreno–Nava, testified that mules were generally poor, sympathetic-looking individuals, who went into the drug courier trade because it is the only way for such individuals to make money quickly. This testimony was admitted over defense counsel's objection.

After the presentation of the evidence, counsel and the trial judge conferred concerning the instructions. The judge indicated that she would not give the defendant's proposed duress instruction, but would give a modified version of the Ninth Circuit Model Jury Instruction on duress. Defense counsel objected, contending that the instruction improperly introduced a requirement of prompt surrender to the authorities as an element of the defense.

On May 20, 1988, the jury returned a verdict of guilty on both counts. On July 11, 1988, Beltran was sentenced to 33 months in custody, and a term of three years of supervised release. This appeal follows. We have jurisdiction under 28 U.S.C. § 1291.

## II.

## DISCUSSION

### A. Admission of Nava's Testimony

Over the objection of defense counsel, the district court permitted Nava to testify about the characteristics of the typical drug courier. Nava testified that "[y]our typical mule would be a poorer individual, who does not wear flashy clothes or jewelry, and is, like I say, in the—he's the bottom of the totem pole in the organization but he is a paid individual by that organization." Reporter's Transcript (RT) vol. II at 275.[1] Beltran argues that admission of this testimony was an abuse of discretion because the use of such profiles is of limited probative value and is extremely prejudicial. The district court has broad discretion to admit or exclude expert testimony. The court's decision to admit Nava's "drug courier profile" testimony therefore is reviewed for abuse of discretion. *United States v. Gillespie*, 852 F.2d 475, 478 (9th Cir.1988).

■ The use of criminal profiles as evidence of guilt in criminal trials has been severely criticized. As the Eleventh Circuit has pointed out,

[d]rug courier profiles are inherently prejudicial because of the potential they have for including innocent citizens as profiled drug couriers.... Every defendant has a right to be tried based on the evidence against him or her, not on the techniques utilized by law enforcement officials in investigating criminal activity. Drug courier profile evidence is nothing more than the opinion of those officers conducting an investigation.... [W]e denounce the use of this type of evidence as substantive evidence of the defendant's innocence or guilt.

*United States v. Hernandez–Cuartas*, 717 F.2d 552, 555 (11th Cir.1983). Similarly, in *Gillespie*, 852 F.2d at 479–80, we found the admission of the testimony of a clinical psychologist describing the common char-

---

**1.** The trial judge instructed the jury to disregard the portion of Nava's testimony in which he stated that "[t]he individual that is generally doing the muling is an older individual...." RT at 274.

acteristics of child molesters to be reversible error.

The hostility exhibited by the lower courts to the use of criminal profiles as substantive evidence of guilt is not undermined by the Supreme Court's recent decision in *United States v. Sokolow,* —— U.S. ——, ——, 109 S.Ct. 1581–1586, 104 L.Ed.2d 1 (1989). *Sokolow* merely establishes that a law enforcement official may make an investigative stop based on observed behavior consistent with DEA drug courier profiles. There is no indication that the Court's approval of profiles to help establish reasonable suspicion warranting further investigation extends to use of profile evidence at trial. Beltran's argument that such profiles generally have no place as substantive evidence of guilt at trial is still valid.

■ The Government, while conceding that profile testimony is generally undesirable as evidence of guilt, argues that Nava's testimony was permissible in this case because defense counsel "opened the door" to this line of questioning by emphasizing Beltran's apparent poverty. The record clearly demonstrates defense counsel's efforts to raise an inference that Beltran was not a drug courier because his life-style was inconsistent with that line of business. In cross-examination of the Government's first witness, Customs Agent Donald Hylton, the following exchange took place:

> Mr. Ainbinder: Does he [Beltran] look essentially the same as he did on the 16th?
>
> A: Yes.
>
> Q: You don't remember any gold rings on his fingers?
>
> A: No. I can't recall any—
>
> Q: Rolex watches?
>
> A: No, sir.
>
> Q: Gold chains?
>
> A: No.
>
> Q: Expensive jewelry, that kind of thing?
>
> A: No.
>
> Q: And as you inspected him in secondary and then in the pat-down area, I take

it you went through his things pretty carefully?

> A: Yes.
>
> Q: Did you find any large amounts of money?
>
> A: No.

RT vol. I at 182.

Defense counsel pursued a similar line of questioning in cross-examination of DEA Agent Eddie Marquez:

> Q: Now, I would like you to take a look at Mr. Beltran as he is seated here today. I know his exact clothing is a little different, but does he appear to be about the same as he was on the 16th of February?
>
> A: Yes, he was.
>
> Q: He's not missing any thing like expensive jewelry or something—
>
> A: No, sir.
>
> Q: Same simple sort of clothes?
>
> A: Yes.
>
> Q: And as he sits here today, is that the same calm look you saw when you entered in the little detention room?
>
> A: Yes.
>
> Q: Now, you said he had a lot of receipts. Have you gone through them all?
>
> A: Yes. I have made xerox copies of everything.
>
> Q: And what we see in those receipts are literally years of collections. Years. Isn't there?
>
> A: That's correct.
>
>      \*     \*     \*     \*     \*     \*
>
> Q: Now, in those receipts is there anything to reflect purchases of things like T.V.'s?
>
> A: None.
>
> Q: Automobiles?
>
> A: None.
>
> Q: Anything to reflect bank accounts with large sums of money?
>
> A: Not that I could tell.
>
> Q: Investments in stocks, bonds or certificates of deposit?
>
> A: No sir.
>
> Q: No documents showing the purchase of a number of head of cattle recently?

A: Not recently. I know there is one said how many he may have owned, but I don't recall exactly.

Q: No purchase of jewelry or that kind of thing?

A: No sir.

Q: You had a chance to go through the rest of Mr. Beltran's things. Do you recall at any time, can you tell us today, did he have a large amount of cash on him?

A: I don't believe he did.

RT vol. II at 235–37.

The purpose of this questioning is clear —counsel is trying to suggest to the jury that Beltran is not part of a smuggling operation because he lacks the accoutrements of wealth associated with such a profitable activity. In light of this testimony, the district court concluded that the Government should have an opportunity to rebut the inference that defense counsel was trying to raise.

What I am going to do is allow limited inquiry. I am worried about too much prejudice on it. . . . So at least I think by having everybody look, you had him stand up, did he have on gold chains, did he appear wealthy, did he have a lot of cash, I think at least it would be proper to say that most of the couriers that they see, that he's aware of are not wealthy and wearing gold chains. They are not on that end of the distribution scheme. Because there's been a suggestion raised by you that, because he's not in gold chains and having a lot of money, he's clearly not involved.

RT vol. II at 271–72. The Government then elicited the testimony from Deputy Nava that Beltran challenges here.

We previously have allowed the Government to introduce otherwise excludable testimony when the defendant "opens the door" by introducing potentially misleading testimony. *See e.g., United States v. Segall*, 833 F.2d 144, 148 (9th Cir.1987) (defense counsel's introduction of cross-examination evidence creating a false impression that defendant retained in her bank account funds under investigation "opened the door" to re-direct testimony that only a fraction of that money was retained); *United States v. Giese*, 597 F.2d 1170, 1188–90 (9th Cir.), *cert. denied*, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979) (defense testimony relating to 18 books owned and read by defendant suggesting his left-wing but non-violent, non-revolutionary political views "opened the door" to cross-examination on other books defendant had sold, owned or read).

This type of rebuttal testimony may include criminal profile testimony. For example, in *United States v. Taylor*, 716 F.2d 701 (9th Cir.1983), the defendant, Steven Pressler, who was convicted of conspiracy to manufacture amphetamines, argued that the trial court erred in not sustaining his objections to certain questions asked by the Government at trial. Pressler's role in the amphetamine manufacturing enterprise was apparently limited to picking up necessary chemicals at a chemical supply store. On cross-examination, defense counsel asked the DEA agent witness whether drug manufacturers use third parties to pick up chemicals to insulate themselves from detection. On re-direct, the prosecuting attorney asked the witness whether, in his experience, these third parties are always, sometimes, or never involved in the illegal manufacturing operation. The witness replied that, in his experience, "innocent" third parties were not used to pick up chemicals. We found that defense counsel "opened the door" to that line of questioning. 716 F.2d at 710.

However, the case most closely on point is the Second Circuit's decision in *United States v. Khan*, 787 F.2d 28 (2d Cir.1986). In *Khan*, the defendant, a Pakistani accused of selling narcotics in the U.S., argued that the trial court erred in allowing the introduction of "irrelevant and unfairly prejudicial" expert testimony about heroin trafficking in Pakistan. The expert witness, a DEA agent, testified that (1) heroin was extremely inexpensive in Pakistan; (2) it was common for Pakistani dealers to advance heroin to each other without immediate payment; (3) heroin dealers in Pakistan, like other Pakistanis, wore the same

national dress—pantaloon, baggy pants, and a knee length top. 787 F.2d at 34.

The appellate court ruled that this evidence was relevant, and that it was within the discretion of the trial court to allow it. The court noted that

> Khan attempted to rebut the government's portrayal of him as a major drug dealer by suggesting that he was a poor man.... The expert testimony was relevant to rebut Khan's arguments to the jury and show that (1) Khan did not need a large sum of money to deal in large amounts of heroin in Pakistan, and (2) even if Khan had made a great deal of money in the heroin trade, it would not necessarily show from the manner of his dress.

*Id.*

Although Beltran is correct that this type of profile evidence is potentially dangerous, the cases suggest that it is permissible in certain limited circumstances. The district court determined that Nava's testimony was necessary to rebut the inference that defense counsel attempted to create. The district court was aware of the potential prejudice, and attempted to keep it at a minimum by sustaining several objections, and striking one portion of Nava's testimony from the record. We conclude that the district judge did not abuse her discretion.[2]

## B. Witness Confrontation

■ Beltran also argues that Nava's drug courier profile testimony, which was based in part upon information obtained from DEA officials, was hearsay, and that admission of this testimony deprived Beltran of an effective opportunity to confront adverse witnesses through cross-examination. Whether Beltran's sixth amendment right to confront witnesses against him was violated is a question of law, reviewed *de novo. United States v. McConney*, 728 F.2d 1195 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Beltran's confrontation argument is without merit.

Nava testified that in his sixteen years as a law enforcement official, he has worked on hundreds of drug cases, with as many as four hundred directly involving smuggling of drugs into the United States. RT vol. II at 251. He also testified that he worked as an undercover agent in Mexico for two years, and that he personally had received drugs from couriers on as many as one hundred occasions. *Id.* at 263. Thus, his opinion about the typical characteristics of drug couriers is derived largely from personal experience.[3] Defense counsel unquestionably had ample opportunity to cross-examine Nava about his expert opinion, and the sources of information upon which that opinion was based. This is a sufficient basis upon which to reject Beltran's confrontation clause argument.

## C. The Duress Instruction

■ Before a defendant is entitled to an instruction on the defense of duress, he must establish a *prima facie* case of the three elements of that defense: (1) an immediate threat of death or serious bodily injury; (2) a well-grounded fear that the threat will be carried out; and (3) lack of a reasonable opportunity to escape the threatened harm. *United States v. Jennell*, 749 F.2d 1302, 1305 (9th Cir.1984), *cert. denied,* 474 U.S. 837, 106 S.Ct. 114, 88 L.Ed.2d 93 (1985); *United States v. Contento-Pachon*, 723 F.2d 691, 693 (9th Cir. 1984). We noted in *Jennell* that a fourth

---

**2.** We emphasize that the holding in this case is a relatively narrow one. The Government may introduce profile testimony of this sort only to rebut specific attempts by the defense to suggest innocence based on the particular characteristics described in the profile.

**3.** To the extent that Nava's testimony was based upon information obtained other than through personal observation, it was permissible, being based upon information of the type reasonably relied upon by experts in forming expert opinions. *See United States v. Golden*, 532 F.2d 1244 (9th Cir.), *cert. denied,* 429 U.S. 842, 97 S.Ct. 118, 50 L.Ed.2d 111 (1976) (holding it proper to admit DEA agent's testimony about market value of heroin where that testimony was based in part upon information obtained from other undercover agents; such information is of the type reasonably relied upon by experts determining prevailing prices in clandestine markets). Beltran does not dispute that Nava is an expert on narcotics smuggling.

element is also sometimes required; the defendant must submit to the proper authorities after attaining a position of safety. 749 F.2d at 1305. However, this fourth element has independent significance only in prison escape cases. *Id.*

■ The district court gave the following instruction relating to duress:

The defendant has offered evidence to show that at the time the crime charged in the indictment was committed, defendant was in fear of his life and the lives of his mother and sister.

A defendant is not guilty of a crime if the defendant participated in it only because of a belief with good reason:

1. That defendant or his family would suffer immediate and serious injury or death if the defendant did not participate; and

2. That defendant had no other reasonable way of escaping such immediate injury or death.

The Government must prove the defendant's guilt beyond a reasonable doubt. To do so, the Government must prove beyond a reasonable doubt either one of the two following elements:

1. That when the defendant committed the crime, defendant did not have a reasonable belief that serious and immediate injury would follow, or

2. That at that time defendant had a reasonable opportunity to escape such serious and immediate injury or death. *In evaluating a reasonable opportunity to escape, you may consider whether defendant took the opportunity to escape the threatened harm by submitting to authorities at the first reasonable opportunity.*

RT vol. II, at 522–23 (emphasis added). Beltran argues that this instruction is erroneous because it permits the Government to satisfy its burden of proof by showing that Beltran did not immediately surrender to the proper authorities upon his initial entry in to the United States. Beltran insists that the highlighted language in the instruction imports a fourth element into the duress defense that is inappropriate outside the context of prison escape cases.

Jury instructions are considered as a whole to determine if they are misleading or inadequate. *United States v. Burgess,* 791 F.2d 676, 680 (9th Cir.1986). The trial judge has substantial latitude in tailoring the instructions, and challenges to the formulation adopted by the court are reviewed for abuse of discretion. *Id.*

The major flaw of Beltran's argument is that the instruction as given does not make submission to the authorities an independent fourth element to a duress defense. The instruction quite clearly invites the jury to consider submission to the authorities as one factor in evaluating the third prong of the duress defense, lack of reasonable opportunity to escape. Nothing in the wording of the instruction suggests that failure to submit to the authorities precludes a finding of duress.

Considering submission to the authorities as an element of opportunity to escape does not appear to be inconsistent with Ninth Circuit authority on duress. As we noted in *Contento–Pachon:*

In cases not involving escape from prison there seems to be little difference between the third basic requirement that there be no reasonable opportunity to escape the threatened harm and the obligation to turn oneself in to the authorities on reaching a point of safety. *Once a defendant has reached a position where he can safely turn himself in to the authorities he will likewise have a reasonable opportunity to escape the threatened harm.*

723 F.2d at 695 (emphasis added). *See also Jennell,* 749 F.2d at 1305 (quoting *Contento–Pachon*). The challenged instruction appears to embody fairly the view expressed in *Jennell* and *Contento–Pachon;* as a practical matter, whether the defendant submits to the proper authorities at the first reasonable opportunity is closely related to whether the defendant has a reasonable opportunity to escape the threatened harm. Taken as a whole, the duress instruction does not appear to be misleading, and the trial judge did not abuse her discretion in adopting this particular formulation.

## III.

## CONCLUSION

Under the circumstances of this case, the district court's carefully considered decision to allow testimony describing the profile characteristics of drug couriers was not an abuse of discretion. The defendant's right to confront witnesses against him was not abridged. The district court's formulation of the jury instructions on duress was not misleading, and was within the discretion of the district court.

AFFIRMED.