972 F.2d 1347
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Juan Carlos ROMERO, Jose Luis Bantula, Antonio Avana,
Humberto Arias, Defendants-Appellants.
 Nos. 90-50304 to 90-50307.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Dec. 4, 1991.
Decided July 16, 1992.
 
 Before: BROWNING, BOOCHEVER and REINHARDT, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Juan Carlos Romero, Jose Luis Bantula, Antonio Avana, and Humberto Arias appeal their jury convictions for conspiracy and possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Bantula also appeals a four-level upward adjustment in his offense level under the Sentencing Guidelines. We affirm.
 
 DISCUSSION
 
 3
 I. Search of the 3721 Palos Verdes Drive residence
 
 
 4
 Bantula, Avana, and Arias challenge the district court's refusal to suppress evidence seized from the Palos Verdes "stash house." They argue that the warrant authorizing the search was not based on probable cause, because police surveillance only established probable cause to search the rear of the residence, where co-defendant Perez earlier had driven the load car, not inside the residence.
 
 
 5
 In reviewing the issuance of a search warrant, we must determine whether the magistrate had a substantial basis for concluding that the affidavit in support of the warrant established probable cause. Illinois v. Gates, 462 U.S. 213, 238-39 (1983). This standard of review is "less probing than de novo review and shows deference to the issuing magistrate's determination." United States v. Angulo-Lopez, 791 F.2d 1394, 1396 (9th Cir.1986). The magistrate need only conclude that it would be reasonable to seek the evidence in the place stated in the affidavit. United States v. Peacock, 761 F.2d 1313, 1315 (9th Cir.), cert. denied, 474 U.S. 847 (1985).
 
 
 6
 There was a sufficient nexus between the activities of Perez and the Palos Verdes house to establish probable cause for the search of the house interior. According to the affidavit, the police saw Perez drive to the rear of the house and then disappear from their sight for ten minutes, during which time he picked up the 50 kilograms of cocaine. Defendants contend that the affidavit fails to include facts which link the cocaine with the residence rather than the backyard--such as the observation of people leaving the house with boxes or other containers of cocaine. It was reasonable, however, for the police and magistrate to conclude that the defendants kept the cocaine inside the house, rather than in the backyard for all to see. See Peacock, 761 F.2d at 1315. It was also reasonable to conclude that Perez had driven to the rear of the residence so that the cocaine could be loaded into the car without attracting attention from neighbors. Cf. United States v. Bertrand, 926 F.2d 838, 840-42 (9th Cir.1991) (affidavit provided probable cause to search outlying real property of residence notwithstanding the fact that police believed that the drug lab was located in the residence).
 
 
 7
 The defendants' reliance on United States v. Howard, 828 F.2d 552 (9th Cir.1987), is misplaced. In Howard, this court concluded that no probable cause existed for the warrantless search of a house, because the police had, at best, a reasonable suspicion to believe that a drug lab existed in the detached garage of the property. Id. at 554-55. In contrast, the officers here did not see the cocaine come from a particular structure other than the house, such as a detached garage. Furthermore, the officers were aware that Perez was planning to make a second delivery of cocaine; thus, they were justified in believing that this additional cocaine would also be at the Palos Verdes property. We therefore affirm the denial of the defendants' motion to suppress evidence from the Palos Verdes house.
 
 
 8
 II. Knock and notice provisions of 18 U.S.C. § 3109
 
 
 9
 Bantula, Avana, and Arias also contend that the police failed to comply with the knock-notice requirement of 18 U.S.C. § 3109 when the police executed the search warrant. The trial court's factual determinations are reviewed for clear error and its application of the law to the facts is reviewed de novo.
 
 
 10
 18 U.S.C. § 3109 (1988) governs the execution of warrants and states:
 
 
 11
 The officer may break open any outer ... door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance....
 
 
 12
 (emphasis added).
 
 
 13
 The facts here indicate that the officers complied with the statute. The police announced their authority and purpose by stating twice in English and Spanish that they were police officers with a search warrant and by demanding entry. They waited 20-30 seconds before forcing open the door. A failure to answer a knock and announcement is regarded as a "refused admittance" and a justification for forcible entry. United States v. Ramos, 923 F.2d 1346, 1356 (9th Cir.1991). While Arias may have been moving towards the door when the police entered, this is unimportant: the elapse of 20-30 seconds before forcible entry constituted enough time to satisfy § 3109 and Fourth Amendment requirements. See, e.g., United States v. Phelps, 490 F.2d 644, 647 (9th Cir.) (elapse of 10-20 seconds justifies forcible entry under § 3109), cert. denied, 419 U.S. 836 (1974). Although Arias testified at the suppression hearing that he heard footsteps, but no announcements, at the door, the judge found the police officers more credible. Because special deference is accorded to a district court's credibility determinations, we find no error in the district court's decision to believe the officers rather than the defendants.
 
 
 14
 Arias also argues that Officer LaCroix' justification for quick entry--fear of evidence destruction--was not supported by the facts. This argument is inapposite, because 18 U.S.C. § 3109 does not require a condition akin to an "exigent circumstance" prior to forcible entry. We affirm the district court's finding that the officers complied with the knock and notice provisions of 18 U.S.C. § 3109.
 
 III. Sufficiency of the evidence
 
 15
 Bantula, Romero, Avana, and Arias argue that the evidence was insufficient to support their convictions. Evidence at trial is sufficient to support a conviction if "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Calabrese, 825 F.2d 1342, 1348 (9th Cir.1987).
 
 
 16
 The elements of conspiracy are: 1) an agreement to accomplish an illegal objective, 2) one or more acts in furtherance of the illegal purpose, and 3) intent to commit the underlying substantive offense. United States v. Penagos, 823 F.2d 346, 348 (9th Cir.1987). Knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions. United States v. Batimana, 623 F.2d 1366, 1368 (9th Cir.), cert. denied, 449 U.S. 1038 (1980). Once there is evidence of a conspiracy, proof of only a "slight connection" between the defendant and the conspiracy is sufficient to convict. United States v. Guzman, 849 F.2d 447, 448 (9th Cir.1988). When a defendant is found guilty of conspiracy, he may be convicted of substantive violations committed by co-conspirators. United States v. Torres-Rodriguez, 930 F.2d 1375, 1382 (9th Cir.1991).
 
 
 17
 The crime of possession with intent to distribute cocaine has three elements: a defendant 1) knowingly, 2) possessed the cocaine, 3) with an intent to distribute it. United States v. Ocampo, 937 F.2d 485, 488 (9th Cir.1991). A person may not be convicted unless he knows contraband is present and he is capable of exercising dominion and control over the contraband. United States v. Behanna, 814 F.2d 1318, 1319 (9th Cir.1987). Possession may be actual or constructive. Constructive possession may be shown by proof that the defendant participated in a joint venture and, thus, shared dominion and control over the contraband. United States v. Restrepo, 930 F.2d 705, 709-10 (9th Cir.1991).
 
 A. Bantula
 
 18
 More than sufficient evidence supported Bantula's conviction: 1) Bantula arrived at the Safeway lot at the same time co-defendant Pelaez was to meet his source to set up the cocaine delivery, 2) Bantula arrived with Perez, the "load car" driver, 3) after Bantula and co-defendant Romero spoke with Pelaez and Perez, Pelaez told DEA Agent Gonzalez that he had met his people and that the cocaine would be delivered, 4) Bantula drove his Jaguar in tandem with the load car down Anza Avenue, 5) Bantula leased the Palos Verdes "stash house" where the cocaine was stored, and 6) receipts for paging devices, which are commonly used by narcotics traffickers, were found among his papers, including one receipt made out to Perez.
 
 
 19
 The cases cited by Bantula, see, e.g., Penagos, 823 F.2d at 348-49 (9th Cir.1987); United States v. Valenzuela, 596 F.2d 824, 830-31 (9th Cir.), cert. denied, 441 U.S. 965 (1979), can be distinguished from the case at bar. The weight of the evidence here establishes a "slight connection" to the conspiracy beyond a reasonable doubt. Bantula affirmatively furthered the object of the conspiracy by driving Perez to the load car and providing the stash house[1] and phone paging devices. Moreover, given that co-conspirators such as Perez had possession of the cocaine, there was sufficient evidence to convict Bantula for possession of cocaine as well. See Torres-Rodriguez, 930 F.2d at 1382.
 
 B. Romero
 
 20
 Romero argues that the evidence is insufficient to support his conviction. We disagree. Evidence of the "slight connection" necessary to convict which linked Romero to the conspiracy included: 1) Romero's presence at the Safeway meeting and his apparent participation in those conversations, his presence with Bantula in the Jaguar driving in tandem with the load car and his presence at the 179th Street house, 3) the discovery of the beepers and yellow paper which the jury could infer were hidden by Bantula and Romero in the mailbox, 4) the discovery of Romero's airplane ticket at the stash house, 5) the yellow paper with numbers and writing, which was found at the stash house with Romero's fingerprint on the back, and 6) Pelaez' statements to Special Agent Gonzales that he was going to meet his source, prior to his meeting with Romero, Bantula, and Perez.
 
 
 21
 Romero contends that he only accompanied Bantula and Perez in the Jaguar on May 12, 1988, and that his mere presence is not enough to constitute the requisite slight evidence of his wilful participation in or knowledge of the conspiracy. See United States v. Weaver, 594 F.2d 1272, 1274 (9th Cir.1979). The evidence, however, indicates more than mere presence. For example, the police did not observe Romero waiting in the Jaguar or passively observing the conversation in the Safeway parking lot, as might be expected of an innocent non-participant. Rather, they saw him and the other three men walking together and gesturing with their hands as if they were conversing. Prior to this meeting, Pelaez had stated he would be meeting his source at the Safeway. Viewing the evidence in the light most favorable to the government, the jury could infer that Romero participated in the Safeway meeting and that he left his fingerprint on the yellow paper with the figures and phone numbers when writing on or handling the paper. Furthermore, it could be reasonably inferred that he was at the stash house where the paper was found and that the figures and phone numbers were related to the drug transaction. These inferences would give rise to the conclusion that he participated in the conspiracy. Once a defendant is found guilty of conspiracy, he may also be convicted of substantive violations, such as possession, committed by co-conspirators. Torres-Rodriguez, 930 F.2d at 1382. We therefore find that there was sufficient evidence to sustain Romero's convictions for conspiracy and possession with intent to distribute cocaine.
 
 C. Avana
 
 22
 There is more than enough evidence to sustain Avana's convictions for conspiracy and possession with intent to distribute. His fingerprints were found on: 1) a one kilo package of cocaine in the stash house, 2) yellow-lined papers[2] in the stash house, and 3) the yellow-lined papers, with the word "perla," found in the mailbox when Bantula and Romero were arrested. Significantly, the word "perla" also appeared on a number of the kilo packages of cocaine found by the police. Avana was also present at the house from the time the load car left the house with the first delivery of cocaine until the search warrant was executed late that night. Finally, an undeveloped roll of film from the stash house contained photographs of Bantula's Jaguar in front of the house and a photograph showing Avana, Arias, and co-defendant Gutierrez together in the house.
 
 
 23
 Avana contends that the government failed to show that he had the requisite connection to and knowing participation in the conspiracy. We disagree. Possession of a large quantity of cocaine may alone be sufficient to infer both knowledge and intent. United States v. Savinovich, 845 F.2d 834, 838 (9th Cir.), cert. denied, 488 U.S. 943 (1988). Furthermore, unlike Avana, the defendants in the cases cited by Avana did not handle or touch the cocaine. See, e.g., Ocampo, 937 F.2d at 488-89; Penagos, 823 F.2d at 350 n. 4.
 
 D. Arias
 
 24
 There is also sufficient evidence to affirm Arias' convictions. The evidence includes: 1) Arias' fingerprints and palmprints on a one kilo package of cocaine found in the bedroom in which the 172 kilograms of cocaine were located, and 2) Arias' presence in the stash house from the time of the load car's departure with the first delivery of cocaine until the search warrant's execution later that day. From these facts, a rational trier of fact could have inferred that Arias had guarded the cocaine and stash house and handled or moved the cocaine, thereby committing the acts of furtherance and intent necessary for conspiracy. Possession with intent to distribute could also be found from co-conspirator Perez' actual possession of the cocaine. See Torres-Rodriguez, 930 F.2d at 1382.
 
 
 25
 Arias renews the familiar argument that mere proximity to the drugs or mere presence at the scene of a crime cannot satisfy the requisite "slight connection" to the conspiracy. Valenzuela, 596 F.2d at 830-31. But again, there was more: Arias' fingerprints on a cocaine package. Cf. United States v. Ramirez, 880 F.2d 236, 239 (9th Cir.1989) (weighing the fact that "fingerprint evidence against Ramirez [is] lacking" in reversing convictions). Hence, we affirm the district court's holding that sufficient evidence supported the four defendants' convictions.
 
 III. Statements of co-conspirators
 
 26
 Romero next challenges the district court's admission of the co-conspirators' statements against him, on the basis that there was insufficient evidence to establish his connection to the conspiracy. Such fact-based challenges to the district court's ruling on co-conspirators' statements are reviewed for clear error. United States v. Vowiell, 869 F.2d 1264, 1267 (9th Cir.1989).
 
 
 27
 Federal Rule of Evidence (FRE) 801(d)(2)(E) provides for admission of hearsay against a party if it is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Such out-of-court statements are only admissible after the government establishes by a preponderance of the evidence that 1) a conspiracy existed and that 2) the defendant was connected to it. Bourjaily v. United States, 483 U.S. 171, 175 (1987). In determining whether the government has established a defendant's connection to the conspiracy, the district court may consider the out-of-court statement, along with all other evidence. Id. at 181. The out-of-court statement standing alone, however, is insufficient to establish participation in the conspiracy. United States v. Silverman, 861 F.2d 571, 577 (9th Cir.1988).
 
 
 28
 Romero primarily objects to the admission of Pelaez' statement to Special Agents Gonzales and Ceren that he had met with his "gente" or his people, after the police had observed Pelaez meeting with Romero, Bantula, and Perez in the Safeway parking lot.[3] Because overwhelming evidence indicated that a conspiracy existed, the relevant inquiry is whether the government proved that Romero was connected to the conspiracy. Pelaez' statement, coupled with the other evidence against Romero outlined above, established Romero's connection to the conspiracy by a preponderance of the evidence. Hence, we find that the admission of the co-conspirators' statements was not clearly erroneous. Bourjaily, 483 U.S. at 180-81.
 
 
 29
 IV. Expert testimony regarding leadership role
 
 
 30
 Bantula and Romero contend that there was an insufficient factual basis for allowing Officer LaCroix, a narcotics expert, to testify at trial that they were leaders of the cocaine deal. We review the district court's decision to admit expert testimony for abuse of discretion or manifest error. United States v. Kinsey, 843 F.2d 383, 388 (9th Cir.), cert. denied, 487 U.S. 1223, 488 U.S. 836 (1988).
 
 
 31
 Rule 702 of the Federal Rules of Evidence provides for the testimony of experts in the form of an opinion if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." The admission of expert testimony requires a proper foundation establishing the witness' expertise, a sufficient factual basis for the opinion, and that the probative value of the evidence outweighs the prejudicial effect. See Edward W. Cleary et. al., McCormick on Evidence § 13, at 33-34 (3d ed. 1984).
 
 A. Factual basis for testimony
 
 32
 Officer LaCroix testified to the jury that "[i]t is my opinion that Mr. Bantula and Mr. Romero were the people in charge of this narcotics transaction." See R.T. 2/15/90, at 16. The factual basis for his opinion included the following information: First, LaCroix was told that Pelaez would meet with the cocaine suppliers in the parking lot and the surveillance thereafter showed that Pelaez met with Bantula, Romero, and Perez. Second, Bantula and Romero arrived with Perez, who later drove the load car to pick up the cocaine. Third, LaCroix believed that "the people who control these transactions generally speaking have other people do the dirty work for them," such as delivering or guarding the cocaine. We find that this information provided a sufficient factual basis for admitting Officer LaCroix's testimony. Cf. United States v. Fleishman, 684 F.2d 1329, 1333, 1336 (9th Cir.) (affirming admission of expert opinion regarding defendant's role relying upon similar factual basis), cert. denied, 459 U.S. 1044 (1982).
 
 
 33
 We are also unpersuaded by Romero's contention that Pelaez' statement could not provide an adequate factual basis for the expert opinion because it was improperly admitted against Romero. In light of our conclusion that this statement was properly admitted under Bourjaily, the jury was entitled to consider the statement as part of the factual basis for the opinion testimony regarding Romero's leadership.
 
 B. Prejudicial impact of testimony
 
 34
 Bantula and Romero also contend that the probative value of the testimony was substantially outweighed by its prejudicial effect. See Fed.R.Evid. 403. In United States v. Fleishman, 684 F.2d 1329 (9th Cir.), cert. denied, 459 U.S. 1044 (1982), this court first recognized that testimony about a defendant's role in an illegal enterprise is distinct from inadmissible opinion about the ultimate issue of guilt or innocence. Id. at 1335-36. Reasoning that FRE 704 allows the admission of opinion testimony embracing an ultimate issue of fact, we affirmed the introduction of expert testimony that the defendant was acting as a "lookout" in a drug conspiracy. Id. at 1336. We also observed that the expert's opinion was necessary to explain the significance of the defendant's seemingly innocuous conduct to the jury. Id. Various cases since Fleishman have permitted the introduction of similar testimony regarding a defendant's role in a drug conspiracy, despite claims that such testimony is unduly prejudicial. See, e.g., United States v. Bosch, 914 F.2d 1239, 1242-44 (9th Cir.1990); United States v. Beltran-Rios, 878 F.2d 1208, 1210-13 (9th Cir.1989); Kinsey, 843 F.2d at 387-89.
 
 
 35
 Faced with this wall of precedent, we are compelled to find that the district court did not manifestly err or abuse its discretion in admitting the expert testimony. Here, Officer LaCroix's testimony had probative value in explaining to the jury why Bantula and Romero would be associated with the conspiracy despite the apparent absence of conduct on their part in delivering or guarding the cocaine. Furthermore, the challenged testimony pertained solely to the surveillance and facts in this case, unlike cases involving more generalized testimony which may offer little probative value. Cf. United States v. Echavarria-Olarte, 904 F.2d 1391, 1397-98 (9th Cir.1990) (expert testimony regarding the Medellin Cartel was irrelevant to defendant's activities); see generally Beltran-Rios, 878 F.2d at 1210-11 (noting the judicial hostility to the use of "drug courier profile" testimony as substantive evidence of guilt).
 
 C. Absence of limiting jury instructions
 
 36
 Finally, Bantula also challenges the court's failure to give the jury an adequate limiting instruction regarding the expert testimony. When there is no objection to the jury instructions at trial, we review for plain error. United States v. Kessi, 868 F.2d 1097, 1102 (9th Cir.1989). Here, Bantula did not request an alternate jury instruction at trial. Since the jurors received a standard expert testimony instruction, in which they were told that they could accept or reject the expert testimony, we find no plain error.
 
 V. Evidence regarding vehicle ownership
 
 37
 Bantula makes several arguments to support his contention that the trial court erroneously admitted into evidence a DMV document showing that he once owned a car with a secret compartment which was registered to Perez.
 
 
 38
 The district court did not abuse its discretion in admitting the DMV record. First, Fed.R.Crim.P. 16 was satisfied, because the record shows that government counsel Clymer gave the document to defense counsel the day after Clymer gained custody of the document from the Torrance Police and the DMV. Second, Bantula did not raise his FRE 404(b) objection at trial. Given the weight of the other evidence against him, admission of the DMV record was not plain error on this basis and did not affect the outcome. See United States v. Houser, 804 F.2d 565, 569-70 (9th Cir.1986). Third, the court did not abuse its discretion in finding that the DMV record was more probative than prejudicial under Fed.R.Evid. 403. The jury had already heard testimony from Officer Packard, without objection from Bantula, regarding Bantula's prior ownership of the car. In any event, even assuming the court erred in admitting the DMV document, Packard's earlier testimony about Bantula's ownership of the car and the weight of the other evidence against Bantula would render any error harmless. Cf. United States v. Alfonso, 759 F.2d 728, 740 (9th Cir.1985) (reversing conviction for erroneous admission of prior bad act where evidence against defendant was only tenuous).
 
 
 39
 VI. Organizer or leader under U.S.S.G. § 3B1.1
 
 
 40
 Finally, Bantula contends that the district court erroneously increased his offense level by four levels for being an organizer or leader of a criminal activity, pursuant to U.S.S.G. § 3B1.1(a). This essentially factual determination is reviewed for clear error. United States v. Smith, 924 F.2d 889, 895 (9th Cir.1991).
 
 
 41
 The Commentary to U.S.S.G. § 3B1.1 suggests that courts should consider the following factors in distinguishing between a "leader" or "organizer" and a "manager" or "supervisor":
 
 
 42
 the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.
 
 
 43
 U.S.S.G. § 3B1.1, comment. (n. 3) (1989).
 
 
 44
 The facts support the district court's finding that Bantula was an organizer or leader. The government's brief recounts these facts, including the fact that Bantula used an "underling" (Perez) to transport the cocaine and a "broker" (Pelaez) to negotiate with the buyer-DEA agent. Cf. United States v. Carvajal, 905 F.2d 1292, 1296 (9th Cir.1990) (affirming upward adjustment for leadership role in cocaine transaction where defendant used underling to deliver cocaine to and pick up money from DEA agent).
 
 
 45
 Bantula claims that he deserved, at most, a two level increase as a "manager" or "supervisor." Notwithstanding the fact that Bantula did not directly negotiate with agents or that there may be an "El Padrone" superior to him, the court's factual conclusion cannot be considered clearly erroneous in light of the evidence suggesting that Bantula had more of an organizing or planning role, rather than a conspicuous negotiating role.
 
 
 46
 Bantula's other arguments also lack merit. Judge Takasugi apparently misspoke at sentencing that Bantula met with the undercover agents, rather than with Pelaez, Perez, and Romero. Because Bantula has made no showing that this misstatement was the basis for his sentence, there is no need to disturb it. See United States v. Messer, 785 F.2d 832, 834 (9th Cir.1986). The court's failure to identify the participants under Bantula's leadership also does not provide a basis for vacating the four level upward adjustment. See United States v. Barbontin, 907 F.2d 1494, 1498 (5th Cir.1990).
 
 
 47
 Accordingly, we affirm the convictions of Avana, Arias, Romero, and Bantula. We affirm Bantula's sentence as well.
 
 
 48
 AFFIRMED.
 
 
 49
 REINHARDT, Circuit Judge, concurring in part and dissenting in part:
 
 
 50
 I concur in all but "Part IV" ("Expert Testimony Regarding Leadership Role") of the majority's disposition. I would reverse the convictions of defendants Bantula and Romero on the ground that the testimony of Officer LaCroix that those defendants were the leaders of a cocaine conspiracy was inadmissible and highly prejudicial.
 
 
 51
 It is understandable why my colleagues feel compelled to follow precedent in which we have permitted law enforcement officers to offer their opinion that a defendant was guilty of performing particular role in a narcotics transactions. See United States v. Bosch, 914 F.2d 1239, 1242-44 (9th Cir.1990); United States v. Fleishman, 684 F.2d 1329, 1335-36 (9th Cir.), cert. denied, 459 U.S. 1044 (1982); United States v. Kinsey, 843 F.2d 383, 387-89 (9th Cir.), certs. denied, 487 U.S. 1223, 488 U.S. 836 (1988). The cases certainly can be read as requiring the result they reach. However, the cases also illustrate how far we have gone in abandoning our traditional concerns for fairness and due process as a result of an almost obscene eagerness to pursue the oft-times self-destructive "war on drugs", no matter what the constitutional cost. On occasion it is difficult to tell whether it is a war on drugs or a war on the Constitution we are conducting. I think that the cases relied upon by the majority are poorly reasoned and can and should be distinguished.
 
 
 52
 Unlike my colleagues, I would draw the line at the cited cases. They are bad enough. We should not go farther. One of the cases affirmed a conviction in which an officer had testified that the defendant was involved in distributing cocaine because "the evidence of [the defendant's] guilt was so overwhelming and convincing that any error in the admission of [the officer's] testimony would be harmless beyond a reasonable doubt." Kinsey, 843 F.2d at 389. Another refused to reverse a conviction in which similar testimony was given because the defendant failed to object, the officer was effectively cross-examined as to the disputed testimony, and the trial court gave jury instructions that minimized the impact of that evidence. See Bosch, 914 F.2d at 1242-44. The third upheld the admission of an officer's testimony that the defendant was a low-level "lookout" for another individual. See Fleishman, 684 F.2d at 1335-36. Thus, all the cases are distinguishable.
 
 
 53
 In the case before us, the officer testified that defendants Bantula and Romero were the kingpins of the conspiracy. The remainder of the evidence against them was weak. I do not believe that the jurors' decisionmaking ability was enhanced by the revelation that Officer LaCroix felt that the defendants were guilty and--what's more--that they were the "leaders" of the drug transaction. I believe, to the contrary, that the testimony was highly prejudicial and that its admission constituted an abuse of discretion. Permitting an officer to state his "expert" opinion that the "typical" leader of a narcotics conspiracy would engage in actions "similar" to those of the defendant and that therefore the defendant is guilty permits massive abuse. As we explained in United States v. Beltran-Rios, 878 F.2d 1208 (9th Cir.1989)--a case that post-dates all but one of the cases relied upon by my colleagues--testimony that relies on the "common characteristics" of narcotics conspirators is "inherently prejudicial": it is an insufficiently reliable indicia of guilt and unreasonably risks the conviction of entirely innocent individuals. See id. at 1210-1213.
 
 
 54
 I believe that the "wall of precedent" cited by my colleagues can and should be distinguished from the case at hand. Allowing a law enforcement official to advise the jury as to the tasks a lookout commonly performs is one matter: allowing him to testify as an "expert" that a defendant is the "leader" of a criminal conspiracy and thus is guilty of the offenses charged is another. Accordingly, I respectfully dissent in part.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Pointing to the fact that he had not stayed in the Palos Verdes house for several months before his arrest, Bantula argues that merely leasing a home that was in the exclusive control of others is insufficient to establish participation in a conspiracy. Cf. United States v. Dunn, 564 F.2d 348, 353 (9th Cir.1977). Although this may be true, there was sufficient evidence beyond the lease of the house to implicate Bantula in the conspiracy
 
 
 [2]
 The government's brief repeatedly refers to the yellow pieces of paper as "drug ledgers." We note that the trial court refused to admit evidence which allegedly showed such a link
 
 
 [3]
 Romero also moved to exclude the conversations between Special Agent Gonzales and co-defendants Roberto Martinez and Jorge Martinez which took place during March and May 1988