**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jose Tamayo BARON, Defendant–Appellant.**

**No. 95–10369.**

United States Court of Appeals, Ninth Circuit.

Submitted July 12, 1996.*

Decided Sept. 4, 1996.

---

* The panel unanimously finds this case suitable for submission on the record and briefs and without oral argument. Fed. R.App. P. 34(a), Ninth Circuit R. 34–4.

Mark R. Lippman, La Jolla, California, for defendant-appellant.

Joan G. Ruffennach, Assistant United States Attorney, Phoenix, Arizona, for plaintiff-appellee.

Before: O'SCANNLAIN and LEAVY, Circuit Judges, and HUFF,** District Judge.

O'SCANNLAIN, Circuit Judge:

We must decide whether the district court committed plain error by giving a *Jewell* "deliberate ignorance" instruction in this drug trafficking case.

I

In February 1995, while driving through Arizona, appellant Jose Tamayo Baron was pulled over for speeding by Department of Public Safety ("DPS") Patrol Officer Jennifer Lynn Huskisson. When Baron rolled down his driver's side window, Huskisson noticed an "overpowering" cherry fragrance coming from inside the car. Baron produced a title for the vehicle; however, the title was not in his name, and it indicated that the record owner had sold the vehicle in November 1994. Baron was also unable to provide a vehicle registration or proof of insurance. When Huskisson asked Baron who owned the car, he stated that it was owned by a female friend whose name he could not recall. He also stated that the female friend had loaned the car to an individual whom he later identified as "Alberto Salgado," and that Salgado had in turn loaned him the car. Huskisson noticed that the car was very clean and contained no luggage or personal effects. She observed a screwdriver on the passenger floorboard, and noted that Baron's hands shook slightly as he handed her his social security card.

Suspecting that the vehicle might be stolen, Huskisson radioed in for a check on the vehicle's registration and title. While waiting for a response, Huskisson continued talking to Baron. Baron told her that Salgado had told him that he had driven the car from Phoenix to Los Angeles for a visit. Baron also claimed that late the night before, Salgado had told him that he (Salgado) had to fly back to Phoenix immediately for an unexpected job interview, and that he had asked Baron to drive the car back to Phoenix for him.

Soon thereafter, Huskisson received negative registration and license checks, indicating that the car was not stolen and that Baron's license was valid. Huskisson asked Baron whether someone was buying the car, and Baron said no, that a *male* friend was letting Salgado use the car. Huskisson then informed Baron that she was issuing him a warning, not a citation. While Baron was walking back to his car, Huskisson asked him if he had any drugs or weapons, a large amount of money, or any kind of contraband in the car. Baron answered each question in the negative. Huskisson then requested and received Baron's written consent to search the vehicle. During her search, Huskisson noticed that screws on the passenger-side running board appeared to have been tampered with, and that there were scratches on the right rear quarter panel.

A few minutes later, a canine unit and other officers arrived. The dogs immediately alerted on the left and right rear quarter panels of the car. Reaching in through the trunk, one of the officers removed a large, round package wrapped in duct tape. The package field-tested positive for amphetamines. Baron was placed under arrest and advised of his *Miranda* rights. He acknowledged that he understood his *Miranda* rights, but did not expressly waive them. He was not questioned further at that point, and did not make any additional statements. A pager was removed from his belt, and $200 was removed from his pocket. The total traffic stop took approximately 20 minutes.

Prior to leaving the scene, Officer Huskisson turned control of the case over to La Paz County Narcotics Task Force Detective Frank Haws. Huskisson informed Haws that Baron spoke and understood English, had consented to a search of his vehicle, and had been read his *Miranda* rights. Haws then searched the vehicle and discovered two hidden compartments, one in each rear quarter panel. The compartments had hinged panels with trunk-lock mechanisms that were connected by wires to the rear defrost switch.

---

** The Honorable Marilyn L. Huff, United States District Judge for the Southern District of California, sitting by designation.

Haws removed packages containing a total of 27 pounds of methamphetamine from the two compartments.

Approximately one and one half to two hours later, at the local DPS office, Detective Haws asked Baron if he wanted to talk, and Baron responded affirmatively. Haws did not provide Baron with additional *Miranda* warnings. Baron told Haws that at 12:30 a.m. the night before, while he was sleeping, he heard Alberto Salgado tapping at his window. He claimed that he had known Salgado for approximately three months. He told Haws the same basic story that he had told Huskisson, stating that Salgado had asked him to drive the car to Phoenix because Salgado had to fly back to Phoenix unexpectedly for a job interview. Baron also stated that Salgado had given him the $200 in cash to purchase a plane ticket back to Los Angeles. He explained that he was supposed to leave the car in an unspecified parking lot at Sky Harbor Airport in Phoenix. At Haws' request, Baron agreed to cooperate by making a controlled, observed delivery of the car and drugs to the airport.

After Baron agreed to cooperate, Haws contacted DEA Agent Shannon Scheel. Haws, Baron and members of the narcotics task force drove to Phoenix, where they met Scheel at approximately 7:30 p.m. at a convenience store. At Scheel's direction, Baron parked the car at the airport. Baron was then taken to a Phoenix Police Department substation. Without readvising Baron of his *Miranda* rights, Scheel asked Baron to retell everything he had told Officer Huskisson and Detective Haws. Scheel told Baron that the case had become a federal case, and that Scheel would honor promises made to Baron by the state officers. Scheel's questioning began at 10:00 p.m. and ended at approximately 12:30 a.m. when Baron stopped cooperating and requested an attorney.

Baron was indicted in March 1995 on one count of possession with intent to distribute methamphetamine and aiding and abetting in violation of 21 U.S.C. § 841(a)(1). Before trial, Baron moved to suppress his statements to Huskisson, Haws and Scheel on the grounds that the statements were involuntary and were obtained in violation of his *Miranda* rights. The district court denied Baron's motion, and all three officers testified during the trial. In addition to testifying to the facts discussed above, Scheel also testified that in spite of the fact that Baron told Scheel that he had been unemployed for the last seven or eight months, Baron's wallet contained receipts for a $12,000 cash down payment on a GMC vehicle, a $900 watch, and an additional $800 in miscellaneous electronic, clothing and accessory purchases. Scheel also testified that agents were never able to locate "Alberto Salgado," despite an extensive search.

Baron testified in his own defense. He claimed that he saw nothing out of the ordinary about the car, that he did not know there were drugs in the car, and that he gave permission to search the car because he did not know there were drugs in it. The central disputed issue in the trial was thus Baron's knowledge of the presence of the narcotics.

During closing argument, the prosecutor erroneously stated that Baron had admitted that he suspected that the car contained drugs:

> And in the middle of the night, with very odd circumstances, [Salgado] asked-allegedly asked Mr. Tamayo Baron to take this car to Phoenix, and Mr. Tamayo Baron jumps to it just as he's order[ed] to do so. *And yet, in spite of all that, maybe this might be drugs, according to him.*

RT 5/24/95 at 52 (emphasis added). The government now concedes that this statement was factually erroneous, and that Baron consistently denied during the trial that he suspected that the car he was driving carried drugs.

Baron was convicted and sentenced to 192 months in prison. He now appeals.

## II

Baron first argues that the district court erred by giving a "deliberate ignorance" instruction based on *United States v. Jewell,* 532 F.2d 697 (9th Cir.) (en banc), *cert. denied,* 426 U.S. 951, 96 S.Ct. 3173, 49

L.Ed.2d 1188 (1976).[1] Because Baron failed to object to this instruction during trial, we review his claim for plain error. *See, e.g., United States v. Kelm,* 827 F.2d 1319, 1324 (9th Cir.1987). In order to prevail, Baron must show that (1) an error occurred; (2) the error was plain, clear or obvious; and (3) the error prejudiced his "substantial rights" in that it "affected the outcome of the proceedings." *People of Territory of Guam v. Cruz,* 70 F.3d 1090, 1092 n. 2 (9th Cir.1995) (citing *United States v. Olano,* 507 U.S. 725, 730–36, 113 S.Ct. 1770, 1776–78, 123 L.Ed.2d 508 (1993)). If Baron is able to meet his burden on these three points, we have authority to reverse his conviction; however, we should exercise our discretion to do so only if the error seriously affected the fairness, integrity or public reputation of the proceedings. *Id.*

### A

In *Jewell,* the defendant was arrested while driving a car across the Mexican–American border with marijuana in a concealed compartment. As was the case here, the defendant was indicted under 21 U.S.C. § 841(a)(1) for possession of controlled substances with intent to distribute. We noted in *Jewell* that section 841(a)(1) "is violated only if possession is accompanied both by knowledge of the nature of the act and also by the intent 'to manufacture, distribute, or dispense.'" *Id.* at 698 (citation omitted). The key question in *Jewell,* as in the instant case, was whether the defendant had the requisite knowledge.

The defendant in *Jewell* claimed that he been paid $100 by an individual named "Ray" to drive the car across the border. He admitted that Ray had offered to sell him mari-juana. He also "did not deny knowledge" of the existence of the secret compartment, but claimed he was unaware that the compartment contained marijuana. A DEA agent "testified that appellant stated 'he thought there was probably something wrong and something illegal in the vehicle, but that he checked it over. He looked in the glove box and under the front seat and in the trunk, prior to driving it. *He didn't find anything, and, therefore, he assumed that the people at the border wouldn't find anything either.'"* *Id.* at 699 n. 2 (emphasis in original).

The district court in *Jewell* gave the following instruction:

> The Government can complete [its] burden of proof by proving, beyond a reasonable doubt, that if the defendant was not actually aware that there was marijuana in the vehicle he was driving when he entered the United States his ignorance in that regard was solely and entirely a result of his having made a conscious purpose to disregard the nature of that which was in the vehicle, with a *conscious purpose to avoid learning the truth.*

*Id.* at 700 (emphasis added). The defendant challenged the district court's use of this instruction, and this court affirmed.

First, we stated that the "knowledge" element in section 841(a)(1) may be satisfied by proof that "the defendant is aware that the fact in question is highly probable but consciously avoids enlightenment...." *Id.* at 704 (footnote omitted).[2] Second, we noted that "there was evidence from which the jury could conclude that appellant spoke the truth-that although appellant *knew of the presence of the secret compartment* and *had knowledge of facts indicating that it con-*

---

1. The court in Baron's case instructed the jury as follows:

 > [Y]ou may find that the defendant acted knowingly if you find beyond a reasonable doubt that the defendant was aware of a high probability that he possessed a prohibitive drug and deliberately avoided learning the truth. You may not find such knowledge, however, if you find that the defendant actually believed that the substance was not a prohibited drug, or if you find that the defendant was simply careless.

 RT 5/24/95 at 60.

2. We explained that "[t]he substantive justification for the rule is that deliberate ignorance and positive knowledge are equally culpable." *Id.* at 700; *see also United States v. Aguilar,* 80 F.3d 329, 331–32 (9th Cir.1996) (en banc) (explaining *Jewell* rationale). Then–Circuit Judge Kennedy dissented, primarily on the grounds that "[w]hen a statute specifically requires knowledge as an element of a crime ... the substitution of some other state of mind cannot be justified even if the court deems that both are equally blameworthy." *Id.* at 706 (Kennedy, J., dissenting).

tained marijuana, he *deliberately avoided* positive knowledge of the presence of the contraband *to avoid responsibility* in the event of discovery." *Id.* at 699 (emphasis added). We cautioned, however, that "[a] court can properly find wilful blindness only where it can almost be said that the defendant actually knew." *Id.* at 704 (citation, internal quotations omitted).

In subsequent cases, we have repeatedly emphasized that a *Jewell* instruction should not be given in every case in which a defendant claims a lack of guilty knowledge, but should be given only "when there is evidence that the defendant has his suspicion aroused, but then ... deliberately omits making an inquiry in order to avoid having actual knowledge." *United States v. Aguilar,* 80 F.3d 329, 331 (9th Cir.1996) (en banc). For example, in *United States v. Mapelli,* 971 F.2d 284 (9th Cir.1992), we explained that a *Jewell* instruction is appropriate

> only when the defendant purposely contrives to avoid learning all the facts, as when a drug courier avoids looking in a secret compartment he sees in the trunk of a car, because he knows full well that he is likely to find drugs there. *It is not enough that the defendant was mistaken, recklessly disregarded the truth or negligently failed to inquire.*

*Id.* at 286 (citations, internal quotations omitted) (emphasis added). *See also Kelm,* 827 F.2d at 1323–24 ("There are few cases in which the facts point to deliberate ignorance. There must be evidence that the defendant purposely avoided learning all the facts *in order to have a defense* in the event of being arrested and charged.") (citation omitted) (emphasis added); *United States v. Fulbright,* 69 F.3d 1468, 1471 (9th Cir.1995) (district court erred in giving *Jewell* instruction because "the evidence showed, at most, reckless avoidance of knowledge"). We reaffirmed these long-standing principles in our recent en banc decision in *Aguilar,* where we observed that absent the required evidence, "the jury might impermissibly infer guilty knowledge on the basis of mere negligence without proof of deliberate avoidance." *Id.* at 332 (quoting *United States v. Pacific Hide & Fur Depot, Inc.,* 768 F.2d 1096, 1098 (9th

Cir.1985) (citations omitted)). We have also held that a *Jewell* instruction "should not be given when the evidence is that the defendant had *either actual knowledge or no knowledge at all* of the facts in question." *United States v. Sanchez–Robles,* 927 F.2d 1070, 1074 (9th Cir.1991) (quotations, citations omitted) (emphasis in *Sanchez–Robles* ).

■ In this case, Baron argues that the government presented insufficient evidence establishing that he (1) suspected that the car contained drugs, (2) deliberately avoided taking steps to confirm or deny those suspicions, and (3) did so in order to provide himself with a defense in the event of prosecution. We agree. The government points to the following evidence in support of its conclusion that the *Jewell* instruction was warranted:

> [D]efendant was approached by "Alberto Salgado," an individual described as anything from a "good friend" to an acquaintance, at his home in the middle of the night. Salgado requested that defendant transport a car to Phoenix the next day. Salgado, who defendant knew only through his car repair work, was himself going to Phoenix the next day, but would not be accompanying the car. The car was to be dropped off either at Salgado's place of employment on Rural Road or at a major airport, but no instructions were given as to where. The defendant's various explanations about how he came into possession of the car and what he was to do with the car, car keys and parking receipt were inconsistent and implausible, especially in light of the fact that the defendant testified that he had no way of contacting Salgado because he had no phone and he did not have Salgado's number.

In addition, defendant acknowledged the strong fruit smell in the car, but did nothing to check it out. A cursory search by Officer Huskisson revealed screws on the passenger side running board that appeared to have been tampered with, a screwdriver, and scratches on the plastic of the right rear panel of the car, where the drugs were eventually found. Those drugs were readily accessible by simply reaching into rear panels through the trunk; it was

not necessary to use the trigger switch to the hidden compartment. Finally, defendant, who allegedly was unemployed, received $200 to make the trip, and he had receipts on his person indicating cash purchase of over $13,000 during his period of unemployment.... [T]hese facts and circumstances all indicate that the defendant tried to "close his eyes" to the fact that he was transporting contraband in the car.

Contrary to the government's contention, none of this evidence establishes that Baron "purposely avoided learning all the facts in order to have a defense in the event of being arrested and charged." *Kelm,* 827 F.2d at 1324. Unlike *Jewell,* there is no evidence that Baron was aware of the existence of the secret compartment in the car, nor is there evidence that he suspected that Salgado was involved in drug trafficking. Quite simply, there is no evidence that Baron "ha[d] his suspicion aroused," *Aguilar,* 80 F.3d at 331, much less that he "deliberately omit[ted] making an inquiry in order to avoid having actual knowledge." *Id.*

Moreover, some of the cited evidence suggests that Baron had *actual* knowledge of the contents of the car. For example, the facts that Baron's stories were inconsistent and implausible, and that he was carrying receipts for large cash purchases even though he was unemployed, suggest that Baron knew he was involved in drug trafficking. However, as noted above, where the evidence suggests that the defendant either had actual knowledge or no knowledge of the relevant facts, a *Jewell* instruction is inappropriate. *Sanchez–Robles,* 927 F.2d at 1074; *United States v. Perez–Padilla,* 846 F.2d 1182, 1183 (9th Cir.1988) (per curiam).

In addition, some of the cited evidence indicates that the circumstances under which Baron agreed to drive the car were suspicious. For example, the strong cherry smell in the car, combined with the circumstances under which Salgado asked Baron to drive the car to Phoenix, arguably suggest that

Baron should have suspected that Salgado might be involved in criminal activities. However, at most the evidence suggests that Baron was negligent or reckless in disregarding the risk that the car contained drugs. As noted above, evidence of negligence or recklessness concerning such a risk is simply insufficient to justify a *Jewell* instruction. *Aguilar,* 80 F.3d at 332; *Mapelli,* 971 F.2d at 286.

 Accordingly, because the government presented no evidence of deliberate ignorance on Baron's part, we conclude that the district court erred by giving the *Jewell* instruction.[3]

**B**

 In light of the absence of evidence supporting the *Jewell* instruction, and in light of our cases holding that the government must present such evidence before a *Jewell* instruction may be given, we also conclude that the error was clear, plain and obvious under the law existing at the time of Baron's trial.

**C**

 We next consider whether Baron has established that the error affected his substantial rights and "affected the outcome of the proceedings." *Cruz,* 70 F.3d at 1092 n. 2. A defendant may satisfy his or her burden on this point by demonstrating "a significant possibility of acquittal had a different instruction been given." *United States v. Harper,* 33 F.3d 1143, 1150 (9th Cir.1994) (citations, internal quotations omitted), *cert. denied,* —— U.S. ——, 115 S.Ct. 917, 130 L.Ed.2d 798 (1995). Accordingly, Baron must demonstrate that there is a significant possibility that he would have been acquitted had no *Jewell* instruction been given.

While this is a close question, we conclude that Baron has met his burden on this point. The evidence in the record suggesting that

---

**3.** We emphasize again today, as we have in the past, that a *Jewell* instruction is rarely appropriate. *See, e.g., Sanchez–Robles,* 927 F.2d at 1073; *Pacific Hide,* 768 F.2d at 1098. The instruction should be given *only* when the government presents specific evidence showing that a defendant

(1) actually suspected that he or she might be involved in criminal activity, (2) deliberately avoided taking steps to confirm or deny those suspicions, and (3) did so in order to provide himself or herself with a defense in the event of prosecution.

Baron actually knew that the car contained drugs is not overwhelming. Accordingly, we conclude that there is a significant possibility that Baron would have been acquitted had the jury not been given a *Jewell* instruction, and that Baron has thus demonstrated prejudice to his substantial rights.

### D

█ We must next decide whether to exercise our discretionary authority to reverse Baron's conviction. We should only do so if we conclude that the error seriously affected the fairness, integrity or public reputation of the proceedings. *Cruz*, 70 F.3d at 1092 n. 2.

Two factors lead us to conclude that we should indeed do so. First, there is a distinct possibility that the jury in this case impermissibly inferred guilty knowledge on Baron's part on the basis of mere negligence or recklessness, without proof of deliberate avoidance. *See Aguilar*, 80 F.3d at 331. Because the jury may have convicted Baron without finding the necessary mens rea required under 21 U.S.C. § 841(a)(1), we believe the error seriously affected the fairness of the trial.

Second, our decision to reverse is also influenced by the fact that the prosecutor stated during closing argument that Baron had admitted that he suspected that the car contained drugs. We agree with Baron that this statement reinforced the improper *Jewell* instruction, and was thus highly prejudicial. The government's erroneous, but presumably inadvertent, · factual assertion provided what the record lacked—"evidence" that Baron suspected that the car contained drugs. The statement compounded the *Jewell* error, and the fairness, integrity, and public reputation of the proceedings were seriously affected as a result.[4]

For the foregoing reasons, we reverse Baron's conviction and remand for retrial.

### III

Baron also raises a number of challenges to the district court's evidentiary rulings.

Because these issues may be relevant in a subsequent retrial, we briefly address them.

### A

█ Baron argues that his Fourth Amendment rights were violated by Officer Huskisson's allegedly protracted traffic stop. Though he concedes that Officer Huskisson's initial stop was proper, Baron contends that Huskisson had "no reasonable suspicion to continue her detention and ask unrelated questions about drug activity." He alleges that the stop thus violated the principles outlined in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We disagree.

In *United States v. Perez*, 37 F.3d 510 (9th Cir.1994), we stated that:

> Questions asked during an investigative stop must be "reasonably related in scope to the justification for their initiation." An officer may broaden his or her line of questioning if he or she notices additional suspicious factors, but these factors must be "particularized" and "objective."

*Id.* at 513 (citations omitted). As the government notes, in this case Huskisson's suspicions that Baron was involved in narcotics activities were based on the following factors: (1) the vehicle did not belong to Baron; (2) Baron could not name the registered owner; (3) Baron was traveling from California to Phoenix under circumstances which sounded suspicious because of the apparent inconsistencies in his stories; (4) the inside of the vehicle looked too clean and contained no personal belongings; (5) there was an overpowering cherry smell coming from inside the car with no visible source; and (6) Baron appeared nervous when he handed Huskisson his social security card. *Perez* suggests that these are "particularized and objective" factors which, when considered individually, may legitimately support a reasonable suspicion of narcotics activities. *Perez*, 37 F.3d at 514. When considered cumulatively, these factors justified additional questioning. *Id.*

---

4. In light of our holding on this issue, we need not consider Baron's argument that the prosecutor's erroneous comment, standing alone, constituted plain error requiring reversal.

B

■ Baron also argues that the district court erred by denying his motion to suppress statements he made to DEA Agent Scheel. He alleges that because Scheel represented the federal government, and because the officer who had previously advised Baron of his *Miranda* rights was a state police officer, Scheel, as the representative of a separate sovereign, was required to separately *Mirandize* Baron before interrogating him. Baron offers no authority for this argument, and we reject it.

As we noted in *United States v. Andaverde,* 64 F.3d 1305, 1311 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1055, 134 L.Ed.2d 199 (1996), Title 18 U.S.C. § 3501(b) enumerates the factors which courts must consider in determining whether a confession is voluntary. Nothing in this statute suggests that when a defendant is separately interrogated by two officers representing separate sovereigns, the second interrogator must independently readvise the defendant of his *Miranda* rights *solely* because he represents a separate sovereign.

In addition, our opinions in *Andaverde* and *United States v. Nordling,* 804 F.2d 1466 (9th Cir.1986) also seemingly undermine Baron's argument. In *Andaverde,* we noted that "[t]he courts have generally rejected a *per se* rule as to when a suspect must be readvised of his rights after the passage of time *or a change in questioners.*" *Id.* at 1312 (emphasis added). We cited *Nordling* in support, explaining that

> [t]his circuit in [*Nordling* ] considered interrogation of a suspect by narcotics agents after questioning by police. *Nordling* held that, because the police had advised the suspect of his rights and "no appreciable time had elapsed" between the end of the police interrogation and the beginning of the narcotics investigation, the narcotics agents were not required to readminister the warnings.

*Andaverde,* 64 F.3d at 1312. Although it is not entirely clear from the *Nordling* opinion whether the police and narcotics officers in that case represented separate sovereigns, we nonetheless conclude that the reasoning in *Nordling* and in *Andaverde* undermines

Baron's argument. The suppression motion was properly denied.

C

■ Finally, Baron argues that the district court erred by allowing the government to introduce certain "drug courier profile" evidence. We reject this contention.

In *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam), the Supreme Court described a "drug courier profile" as "a somewhat informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics." *Id.* at 440, 100 S.Ct. at 2754. This court has repeatedly noted that the government may not use such profiles as evidence of substantive guilt. *See, e.g., United States v. Ogbuehi,* 18 F.3d 807, 812 (9th Cir.1994); *United States v. Lim,* 984 F.2d 331, 334–35 (9th Cir.), *cert. denied,* 508 U.S. 965, 113 S.Ct. 2944, 124 L.Ed.2d 692 (1993); *United States v. Lui,* 941 F.2d 844, 847 (9th Cir.1991). As we have explained, "[t]he admission of drug courier profile evidence is inherently prejudicial to the defendant because the profile may suggest that innocuous events indicate criminal activity." *Lim,* 984 F.2d at 334–35 (citation omitted).

■ However, the court has recognized certain exceptions to the general rule. In *United States v. Beltran–Rios,* 878 F.2d 1208 (9th Cir.1989), we held that a defendant who had implied that he was not a courier because he did not fit the profile had "opened the door" to the introduction of evidence on the issue by the government. However, we emphasized that "the holding in this case is a relatively narrow one. The Government may introduce profile testimony of this sort only to rebut specific attempts by the defense to suggest innocence based on the particular characteristics described in the profile." *Id.* at 1213 n. 2.

The present case falls squarely within the *Beltran–Rios* exception. During the government's case in chief, the defense cross-examined one of the government's witnesses by asking the following questions concerning the search of appellant's car:

Q. Anything else significant that you found about the vehicle?

A. I don't quite understand the question.

Q. Well, for example, did you find any *large sum of money* secreted in a compartment?

A. No, I did not.

Q. Did you find any *ledgers showing drug transactions, any kind of contact people, addresses,* and that kind of nature?

A. No, I did not.

Q. Did you find anything in that vehicle itself of an evidentiary value, other tha[n] the fact that there was a compartment with the drugs in the compartment?

A. That and the air freshener—

Q. Air fresheners.

A. —I believe were the only things.

Q. There were no—*no evidence of drugs or drug paraphernalia in the vehicle itself,* carpets, ashtrays, seats, anything to show that drugs were recently used or ingested in that vehicle.

A. No.

Q. There was no evidence of drugs or paraphernalia in the ashtrays of the vehicle?

A. Not that I recall, no.

RT 5/23/95 at 62–63 (emphasis added).

As was the case in *Beltran–Rios,* defense counsel's questions were clearly designed to suggest that Baron was not a drug courier because he did not have with him the items which a typical courier might be expected to carry. The district court concluded that the defense had thus opened the door, and, over Baron's objection, allowed the government to ask an expert on drug smuggling operations whether it was unusual for a drug courier *not* to be carrying (1) large amounts of cash, (2) drug ledgers or lists concerning the drugs, or (3) drug paraphernalia. RT 5/23/95 at 175–80. These questions were used "only to rebut specific attempts by the defense to suggest innocence based on the particular characteristics described in the profile," *Beltran–Rios,* 878 F.2d at 1213 n. 2, and as such we

reject Baron's argument that the district court abused its discretion.

## IV

For the foregoing reasons, we affirm the district court's evidentiary rulings, but reverse Baron's conviction and remand for further proceedings not inconsistent with this opinion.[5]

**AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

---

5. In light of our disposition of this case, we need not address Baron's contention that one of the prosecutor's statements during closing argument constituted impermissible vouching.