UNITED STATES, Appellee,

v.

Stefanie L. SOUTHWICK, Captain,
U.S. Air Force, Appellant.

No. 99–0832.
Crim.App. No. 32667.

U.S. Court of Appeals for
the Armed Forces.

Argued March 1, 2000.

Decided Aug. 30, 2000.

GIERKE, J., delivered the opinion of the Court, in which EFFRON, J., and COX, S.J., joined. SULLIVAN, J., filed an opinion concurring in part and in the result. CRAWFORD, C.J., filed an opinion concurring in the result as to Issue I and concurring as to Issue II.

For Appellant: *Captain Michael J. Apol* (argued); *Colonel Jeanne M. Rueth* (on brief); *Lieutenant Colonel James R. Wise.*

For Appellee: *Captain Peter J. Camp* (argued); *Colonel Anthony P. Dattilo* and *Lieutenant Colonel Ronald A. Rodgers* (on brief); *Major Steven R. Parrish.*

Judge GIERKE delivered the opinion of the Court.

A general court-martial convicted appellant, contrary to her pleas, of conduct unbecoming an officer, wrongfully distributing ecstasy, and wrongfully distributing cocaine (2 specifications), in violation of Articles 133 and 112a, Uniform Code of Military Justice, 10 USC §§ 933 and 912a, respectively. The court-martial sentenced her to a dismissal, confinement for one year, and total forfeitures. The convening authority approved the sentence except for all but 14 days of unserved confinement. In an unpublished opinion, the Court of Criminal Appeals affirmed the findings and sentence, but granted relief from the provisions of Article 57(a), UCMJ, 10 USC § 857(a). *See United States v. Gorski*, 47 MJ 370 (1997).

Our Court granted review of the following issues:

I

WHETHER IT WAS PLAIN ERROR TO ALLOW THE INTRODUCTION OF TESTIMONY THAT THE PROSECUTION'S SOLE WITNESS TO THE ALLEGED OFFENSES UNDERTOOK AN OSI POLYGRAPH.

II

WHETHER IT WAS PLAIN ERROR FOR THE MILITARY JUDGE, AFTER HEARING APPELLANT'S UNSWORN STATEMENT WHEREIN SHE DE-
TAILED THE PRETRIAL PUNISHMENT TO WHICH SHE HAD BEEN SUBJECTED, TO NOT ADDRESS THIS ISSUE AND GRANT ADDITIONAL CONFINEMENT CREDIT.

For the reasons set out below, we affirm.

## I. POLYGRAPH EVIDENCE

### A. Factual Background

Senior Airman (SrA) Randall, an enlisted security policeman working as an informant for the Air Force Office of Special Investigations (OSI), was a key prosecution witness. SrA Randall testified that he made three controlled buys of drugs from appellant. Immediately after the third controlled buy, OSI agents and local police executed a search warrant at appellant's apartment and seized the marked money used by Randall to make the controlled buy.

During cross-examination by defense counsel, Randall was asked about the investigation of his background before he became an informant. He responded, "Agent Andreini checked with some of my work colleagues. He checked my 398. I even underwent a polygraph test at Randolph Air Force Base."

Defense counsel called an expert witness to show that OSI had conducted an inadequate background investigation of Randall before relying on him as an informant. During cross-examination by trial counsel, the expert witness admitted that he did not review the background investigation of Randall. Trial counsel asked, "[A]nd do you know that they gave Airman Randall a polygraph?" The witness responded, "I just heard it through the testimony, I didn't review it on paper that he had been administered a polygraph."

The prosecution then called OSI Special Agent (SA) Otis to defend the OSI's methods to establish the reliability of their informants. During cross-examination, defense counsel asked SA Otis what kinds of things were done other than examining records. SA Otis responded:

When you're dealing with someone as a potential informant, you interview them,

attempt to determine what their motivation is, what their access is, what's transpired, that brings them to you to begin with. You conduct background checks, run computer checks to determine whether the individual has any sort of a criminal record. Again, go to a personnel jacket, find out if he has a UIF [unfavorable information file], what other information might not be readily apparent. Secondarily to that, we generally use a polygraph examination.

\* \* \*

We're talking in generalities here, are we not? I told you—I referenced a few minutes ago the fact that this gentleman [Randall] was polygraphed, which is generally one of the things that we do to, again, establish the veracity of the person that's involved.

During argument on findings, trial counsel argued that Randall was not the typical informant trying to cut a deal after getting caught in the drug trade. He argued that Randall's background had been thoroughly checked, that he was "an elite gate guard" with a high-level security clearance. He mentioned that OSI polygraphed him before accepting him as an informant.

At no time during the trial did defense counsel object to the mention of the polygraph or move to strike any testimony regarding the polygraph or request limiting instructions.

### B. Discussion

Mil.R.Evid. 707, Manual for Courts–Martial, United States (1998 ed.), provides: "Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted in evidence." The constitutionality of this blanket prohibition was upheld by the Supreme Court in *United States v. Scheffer*, 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998).

■ Where, as in this case, there was no timely objection to polygraph evidence,

we review for plain error. We will take notice of asserted errors even though not raised at trial if the appellant demonstrates that there was an error, that the error was clear or obvious, and that the error materially prejudiced appellant's substantial rights. *United States v. Powell*, 49 MJ 460, 465 (1998). Although there was an error in this case that was clear or obvious, appellant has not convinced us that a substantial right was materially prejudiced. The relationship between the polygraph and the evidence on the merits is even more attenuated in this case than it was in *United States v. Clark*, 53 MJ 280 (2000). In this case, the polygraph evidence was not presented as substantive proof of the offenses. There was no evidence of the subject matter of the polygraph interview and no evidence of any responses to questions. There is no suggestion that the polygraph was used to measure the truthfulness of SrA Randall's reports to his OSI superiors regarding appellant's misconduct. The polygraph was not mentioned to bolster any aspect of Randall's testimony. It was mentioned merely to describe one of the many steps used by the OSI at the outset to determine that Randall was sufficiently trustworthy to be used as an informant. Finally, it was defense counsel who elicited the disclosure regarding the polygraph examination.

### II. PRETRIAL PUNISHMENT

#### A. Factual Background

During an unsworn statement on sentencing, appellant stated:

Since February, I've been working at the HAWC on Main Base Kelly which is the Health and Wellness Center. I've been working at the front desk as a receptionist. I'm the only military person at the HAWC, the Health and Wellness Center, who is not allowed to wear their uniform. I have had to wear civilian clothes every single day. I've been stripped of my rank. I've been called Stefanie by all personnel, including enlisted and all GS employees, including a GS–5, and given work by these people. When I brought my concerns regarding this matter to Lieutenant Colonel

Kuhfahl, my commander, . . . they decided it was acceptable for everyone to call me Stef.

A handwritten copy of the statement was admitted and given to the court members.

The defense argument on sentencing included the following:

To the extent that you're wanting Captain Southwick to think about what's happened and what she did wrong, consider what she's been dealing with since February of this year working at the HAWC. Members, she's still a Captain in the United States Air Force, and she's not allowed to wear her uniform to work. She's not allowed to call herself Captain Southwick. She's not referred to as Captain Southwick or ma'am by the enlisted members, by the low ranking GS personnel. She's not doing work for which she's qualified and which is commensurate with her grade. Members, that's punishment, and it also gives her time to think about and reflect on what it was she did that brought her to that station in life. And think about how her commander, Colonel Kuhfahl, reacted when she voiced her concerns. Sir, I'm not being treated like a captain. I'm under investigation. I'm pending court-martial. I'm still a captain in the United States Air Force. That's okay. Everybody can call you Stef. The enlisted members, the civilians, they're going to give you work, and you're going to have to do it. And, members, that is punishment. It's pretrial punishment, and you need to consider the effect that had on her and on the Air Force at large, that unit. You have got to weigh that.

Trial counsel responded with the following argument:

[Defense counsel] also made some comments about how [appellant's] been punished already because she's been stripped of her rank and people call her Stef. Well, what did she say to Senior Airman Randall to call her? Stef. What did he call her on the tape? Hey, Babe. Did she get ticked off about that? What's the difference? Tell me where there's punishment there.

The defense did not ask the military judge to give appellant credit for pretrial punishment, and the military judge did not do so sua sponte. However, after trial, five of the seven members who sat on appellant's case submitted recommendations for clemency. The recommendation for clemency from the second-ranking member included the following:

c. The seemingly callous handling of Capt Southwick by our "Air Force Family" from her time of arrival here, after the death of her father, and through the preliminary portions of her court martial go against the common decency and camaraderie I have come to appreciate in my professional career. In essence (as revealed in the court record), Capt Southwick was stripped of her uniform, made to wear civilian clothes to work, and was addressed as a civilian throughout the time she was awaiting proper trial and sentencing.

d. Finally, the Court President (Col Livingston) and I were so disturbed by the chain of events listed above that we personally brought our concerns to [the convening authority], in the hopes that these kinds of situations might be averted in the future. I am firmly convinced that our Air Force "family" should and will do better not only in taking care of our own, but also in treating our officers with the appropriate respect due them until they are relieved **officially** of their rank and responsibilities by a proper court.

Contrary to his staff judge advocate's recommendation, the convening authority disapproved all unserved confinement except for 14 days, effectively reducing the confinement to time served plus 14 days. This action served to reduce appellant's period of confinement from the adjudged one year to slightly less than 8 months.

Post-trial affidavits from appellant, her squadron commander, and her squadron section commander were submitted to the court below. All parties agree that appellant worked for approximately 6 months at the Health and Wellness Center (HAWC) and that she worked in gym clothes instead of a military uniform.

Appellant's commanders do not dispute her statement that she was commonly addressed by her first name instead of by rank, and that she complained to them about it. They dispute her contention that they instructed her to identify herself by her first name instead of by rank. Her squadron section commander stated that she offered to speak with the HAWC director about the appropriate manner of addressing appellant but appellant did not raise the issue again.

Appellant's commanders dispute her assertion that she was assigned to the HAWC against her will. They state that she requested the HAWC assignment.

Appellant's commanders dispute her assertion that she was not allowed to wear her uniform. They state that she seemed pleased with working in gym clothing instead of a uniform.

### B. Discussion

Article 13, UCMJ, 10 USC § 813, prohibits pretrial punishment. In *United States v. Palmiter*, 20 MJ 90, 95 (1985), this Court said that "in the absence of a showing of intent to punish, a court must look to see if a particular restriction or condition, which may on its face appear to be punishment, is instead but an incident of a legitimate nonpunitive governmental objective[,]" *quoting Bell v. Wolfish*, 441 U.S. 520, 539 n. 20, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In *United States v. Huffman*, 40 MJ 225, 227 (1994), a closely split decision, this Court held that pretrial punishment is not waived by failure to raise the issue at trial, "unless there is an affirmative, fully developed waiver on the record."

■ We hold that appellant's trial tactics were tantamount to an affirmative waiver in this case, because they involved an election between two available alternatives. It is clear from the record that appellant made a tactical decision to take the pretrial-punishment issue to the members instead of asking the military judge for appropriate relief under RCM 906, Manual, *supra*. *Cf. United States v. Gammons*, 51 MJ 169, 182–84 (1999) (In a trial with members, an accused has the option to request credit for nonjudi-

cial punishment from the military judge or present the issue to the members during the sentencing hearing.); *United States v. Edwards*, 42 MJ 381 (1995) (In a bench trial, an accused has the option of seeking relief for prior nonjudicial punishment from the military judge or the convening authority.). In her oral unsworn statement before the members, appellant asserted that she had been mistreated. She presented the members with a written statement making the same complaint. In sentencing argument, her counsel argued that she had been the victim of pretrial punishment.

The tactic was successful, because five of the seven members submitted recommendations for clemency, and the two most senior members were so outraged that they personally brought the matter to the attention of the convening authority. Appellant raised the issue again with the convening authority. The convening authority rejected his staff judge advocate's recommendation and granted clemency by reducing appellant's confinement to time served plus 14 days. In our view, this record amply demonstrates a tactical decision to seek relief for pretrial punishment from the members instead of the military judge.

■ We cannot determine precisely how the evidence affected the deliberations on sentence. *See* RCM 1007(c) and Mil.R.Evid. 606(b) (inquiry into deliberations and voting prohibited). However, the clemency petitions and post-trial action clearly demonstrate that the evidence had a substantial impact on the members and the convening authority. We hold that, under the circumstances of this case, it was not plain error for the military judge not to grant, *sua sponte*, additional confinement credit for pretrial punishment.

### III. Decision

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

SULLIVAN, Judge (concurring in part and in the result):

I agree that in a plain-error case the burden is on appellant to show error which

"materially prejudice[d] . . . substantial rights." Article 59(a), UCMJ, 10 USC § 859(a). I also agree that in determining whether such prejudice exists, the appellate court must look at how the outcome of the proceedings was impacted by the error. Anything said in *United States v. Powell*, 49 MJ 460 (1998), to the contrary, should be disregarded as *dicta*.

As for the second issue in this case, I disagree that waiver occurred in this case. However, I agree there was no plain error shown in this case and can join the majority in affirming. Appellant did not show that her pretrial assignment and treatment was intended as punishment. *See Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

CRAWFORD, Chief Judge (concurring in the result as to Issue I and concurring as to Issue II):

I disagree that admission of the polygraph evidence to support the background check of an informant was error. The majority seeks to avoid admission of the "P" word where a party opponent aims in bad faith to draw an inference that can be shown to be untrue based on evidence that a polygraph was administered. Certainly the opponent is allowed to rebut the improper inferences.

The defense theory of the case was to attack the investigation conducted by the Office of Special Investigations (OSI), specifically the reliability of the informant. Of the three controlled buys of drugs from appellant, only the last buy was recorded because the informant was wired. On cross-examination and in response to a question by defense counsel, the informant testified that he was given a polygraph before becoming an informant, as part of his background check. There was no objection or motion to strike. Trial defense counsel also called Mr. Stephen Saunders, as the defense expert, to show that the OSI conducted an inadequate background investigation. During the cross-examination of Mr. Saunders, trial counsel elicited the fact that the informant was given a polygraph as part of his background check. Special Agent Dana P. Otis was called to talk about the methods employed to establish credibility of informants before they are used by the OSI. Later, during defense counsel's cross-examination, Agent Otis mentioned use of polygraphs to establish an informant's credibility. Again, there was no objection or motion to strike.

By not objecting or moving to strike the initial answer by the informant, the defense opened the door for additional questions by trial counsel. "[W]e have consistently declined to support a rule which would permit the defense to induce the error and then take advantage of it on appeal." *United States v. Catt*, 1 MJ 41, 47 (CMA 1975).

Professor Imwinkelried sets forth an example of opening

> the door for the introduction of otherwise inadmissible evidence. Suppose, for example, that on cross-examination of a police officer, the defense challenges the thoroughness of the investigation that led to the accused's arrest. On redirect to meet that challenge, the prosecution may elicit the officer's testimony that she saw no need for further investigation because she learned that the accused had failed two polygraph tests about the crime. The prosecution may do so even if polygraph evidence is ordinarily inadmissible in the jurisdiction.

Edward J. Imwinkelried, Paul C. Giannelli, Francis A. Gilligan, & Frederic I. Lederer, *Courtroom Criminal Evidence* § 304 at 80 (3d ed.1998)(footnotes omitted).

The defense could have used the discovery process to determine whether various investigative techniques were used, including polygraph examinations of the informants or victims. *See United States v. Simmons*, 38 MJ 376 (CMA 1993)(prosecution had a duty to disclose statements made during polygraph examination of victim). Instead, the defense chose to raise in bad faith an inference it knew to be untrue hiding behind what they hoped to be inadmissible evidence, *e.g.*, a polygraph. *See Paxton v. Ward*, 199 F.3d 1197 (10th Cir.1999)(prosecution argued in bad faith knowing that exculpatory polygraph evidence was not admissible). We cannot sanction this conduct by permitting

such inferences to go unrebutted just because polygraph evidence is at issue; to do so would provide a "safe harbor" for improper trial tactics.

Even if the door is not opened by the defense when the defense attacks the background check of an informant, the Government must be able to respond without one hand tied behind its back. It is a common investigative technique to employ polygraphs to ensure the reliability of informants before they are used. *See United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980). Without this evidence to rebut the inference of an inadequate background check, court members would be presented with an incomplete picture. *See, e.g., Paxton,* 199 F.3d at 1216–17.

Likewise in *United States v. Baron,* 94 F.3d 1312 (9th Cir.), *cert. denied,* 519 U.S. 1047, 117 S.Ct. 624, 136 L.Ed.2d 546 (1996), the defendant opened the door on cross-examination to the inference that the defendant was not a typical drug courier. The court held that while profile evidence is normally inadmissible, the prosecution may use profile evidence on redirect examination to rebut this defense inference. *Id.* at 1321. Also, in *Clark v. State,* 332 Md. 77, 629 A.2d 1239 (1993), the court indicated that the judge has the discretion to permit inadmissible evidence to be admitted if prejudicial inadmissible evidence was admitted without timely objection or timely motion to strike. Maryland Rule 5–611(a) allows the judge to admit inadmissible evidence to "make the interrogation and presentation effective for the ascertainment of the truth."

This is not an instance where the prosecution is seeking to introduce a polygraph of a party-opponent related to the charges in the case. Rather, the purpose of the polygraph is solely to determine whether investigators performed an adequate background investigation on an informant before the informant was involved in the case. The federal courts have held that while polygraphs are not admissible except in limited circumstances, a polygraph examination may be used to establish the reliability of the informant. *Cf. United States v. Light,* 48 MJ 187 (1998). Likewise, where a confession is obtained from a suspect as a result of a polygraph examination, we would not exclude the evidence that the polygraph partially induced the confession. *See United States v. Kampiles,* 609 F.2d 1233, 1244 (7th Cir.1979), *cert. denied,* 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980). The majority would apparently allow the defense a safe harbor anytime the "P" word is used.

As to Issue II this Court has dealt with this issue on a case-by-case basis. Now, however, this opinion, as well as *United States v. Rosendahl,* 53 MJ 344 (2000), and *United States v. Rock,* 52 MJ 154 (1999), provide additional guidance and hopefully some uniformity and certainty.

This Court has been diligent in ensuring that servicemembers are provided credit for pretrial confinement,[1] restriction tantamount to confinement,[2] Article 13 violations, and prior non-judicial punishment under Article 15, UCMJ, 10 USC § 815.[3]

Credit may also be given for failure to provide: counsel, RCM 305(f); a review by the commander, RCM 305(h); a 48–hour review, or a 7–day review, RCM 305(i); and a review by the military judge, RCM 305(j). But we should encourage defense counsel to seek credit in the first instance at the court-martial. If I were advising defense counsel today, I would recommend that they not raise the issue at trial where the Government would have a chance to present a case but rather raise the issue on appeal on the basis of affidavits after memories have grown stale, individuals have moved, and the Government has greater difficulty rebutting the allegations. *See United States v. Branch,* No. 9801790 (Army Ct.Crim.App., March 7, 2000), *pet pending,* No. 00–0381 (2000)(petition to obtain additional credit for an alleged violation of Article 13—issue not raised at court-martial or before Court of Criminal Appeals).

---

1. *United States v. Allen,* 17 MJ 126 (CMA 1984).

2. *United States v. Mason,* 19 MJ 274 (CMA 1985).

3. *United States v. Gammons,* 51 MJ 169 (1999).

The accused serves as the gatekeeper in deciding who should apply the credit. Where the allegations of the onerous conditions are presented to the sentencing authority prior to sentencing, including Article 13 violations and prior non-judicial punishment, those factors will be taken into consideration when the sentence is adjudged and are not required to be applied against the approved sentence. The convening authority has the option to grant clemency or otherwise reduce the sentence for any or no reason.

As this Court stated in *United States v. Rock, supra*, whenever there is a trial by judge alone, the judge can announce on the record that the credit was given for any of the areas mentioned above.

> Thus, credit against confinement awarded by a military judge *always* applies against the sentence adjudged—unless the pretrial agreement itself dictates otherwise.

52 MJ at 156–57 (emphasis in original).

The judge in *Rock* refused to treat various restrictions on pretrial liberties as restriction tantamount to confinement or a violation of Article 13. However, the judge found that not allowing an infantryman to train in his military specialty and to perform normal basic details was a violation of Article 13 and awarded 1.5 days credit per day of punishment. The only issue in *Rock* was whether the credit should be applied against the adjudged or approved sentence. After listing the various credits mentioned earlier, including *United States v. Allen*, 17 MJ 126 (CMA 1984); *United States v. Pierce*, 27 MJ 367 (CMA 1989); *United States v. Suzuki*, 14 MJ 491 (CMA 1983); and RCM 305(k), the *Rock* Court stated:

> Where there is no pretrial agreement ... the credit can only be applied against the adjudged sentence; ... The adjudged sentence becomes a maximum punish-

ment.... Here, of course, the military judge did just that.

52 MJ at 157.

Where the adjudged sentence is less than the maximum provided in the agreement, the adjudged sentence establishes the maximum confinement.

> Where portions of that confinement have already been served, actually or constructively, the credit applies against the agreement; otherwise the accused's sentence will exceed the maximum lawful limit.

This Court said that the "time credited by the military judge, however, did not involve confinement, nor was it tantamount to confinement." Thus, no action was required by the convening authority in approving the sentence. "Servicemembers are not entitled to sentence credit against confinement for any and all time during the pendency of court-martial charges, even if restraints on liberty which are not tantamount to confinement are imposed." 52 MJ at 157.

However, in any trial by members, the accused is the gatekeeper as to Article 13 violations, prior non-judicial punishment, and restrictions on liberty that have not been determined tantamount to confinement. This may be part of the extenuation and mitigation presented to the members. In any event, the members may be instructed based on a request of a party that the accused will get credit for pretrial confinement of day-for-day for a certain period of time. This allows the members to decide what the sentence might be in any particular case. Where the instruction is given in a trial before members, the day-for-day credit for pretrial confinement and restriction tantamount to confinement will not be applied to the approved sentence where the accused as a gatekeeper decides to present the information as to Article 13 violations, unduly rigorous circumstances, or prior non-judicial punishment to the members.

For this reason I concur in the result as to Issue I and concur as to Issue II.